*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____



IHSAN ALI BAZZI,

　　　　　　　　　　*Petitioner,*

　　*v.*

　　　　　　　　　　No. 12-3759

ERIC H. HOLDER, JR.,

　　　　　　　　　　*Respondent.*

Upon Petition for Review of an Order of Removal
of the Board of Immigration Appeals.
No. A 027 937 455.

Argued: October 30, 2012

Decided and Filed: December 19, 2013[*]

Before: BOGGS and SUTTON, Circuit Judges; and CLELAND, District Judge.[**]

_____

## COUNSEL

**ARGUED:** Maris J. Liss, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan for Petitioner. Tim Ramnitz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent **ON BRIEF:** Maris J. Liss, George P. Mann, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan, for Petitioner. Tim Ramnitz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

[*] This decision was originally issued as an "unpublished decision" filed on December 19, 2013. The court has now designated the opinion as one recommended for full-text publication.

[**] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.   Petitioner Ihsan Bazzi, a Lebanese national, seeks review of a Board of Immigration Appeals (BIA) decision dismissing his appeal of an immigration judge's (IJ) order denying his application for adjustment of status and ordering his removal from the United States.  Because the decision of the immigration judge is supported by substantial evidence, we deny Bazzi's petition for review.

I

The petitioner, Ihsan Bazzi, and his purported ex-wife, Adla, were married in 1975 in Lebanon.  During their marriage, they lived in Lebanon while Bazzi served in the South Lebanese Army.  In 1986, following the birth of five of their six children, Mr. and Mrs. Bazzi obtained a divorce from a Lebanese court allegedly because the then-Mrs. Bazzi did not want to accompany him to the United States.  Shortly after the divorce was obtained, Adla gave birth to their sixth child.

In 1987, Bazzi's father, who had recently been admitted to the United States as a lawful permanent resident, successfully petitioned for a second-preference visa for an unmarried child.  Bazzi then went to the United States Embassy in Tel Aviv in order to apply for an immigrant visa.  During the application interview, the consular officer's suspicions were raised by the fact that Bazzi's sixth child was born after the date of the divorce.  When questioned about the current state of their relationship, Bazzi said that he and his wife were on good terms and that she saw their children twice a week but when the consular officer later interviewed Adla, she told him that she had not seen Bazzi or her children since the divorce.  Additionally, Kathy Bazzi, his sister-in-law, informed the Embassy that Bazzi was still married and that the divorce was obtained fraudulently. All of this evidence led the consular officer to conclude that Mr. and Mrs. Bazzi had obtained a sham divorce and that Bazzi was therefore ineligible for a visa, a

finding reiterated by the State Department following Bazzi's efforts to provide additional evidence on his own behalf.

Two years later, in 1991, Adla entered the United States as an unmarried child of a lawful permanent resident, followed by the Bazzis' children, all of whom, as well as Adla, are now citizens. In 1995, Bazzi entered the United States without permission or parole and remained illegally for eight years until 2003, when he filed the application for adjustment of status, which was denied in 2008 and which prompted the Notice to Appear (NTA) that initiated this case.

Bazzi appeared at removal proceedings in 2008 at which he conceded seven of the eight factual allegations and two of the three charged violations of the Immigration and Nationality Act (INA) set forth in the NTA. Bazzi's admissions left one remaining factual issue and one remaining charge for adjudication: the allegation that Bazzi willfully misrepresented a material fact in order to procure an immigration benefit and the resulting violation of 8 U.S.C. § 1182(a)(6)(C)(i).

The IJ conducted two merits hearings, in July 2009 and February 2010, during which he took testimony from Bazzi, members of his family, and two Immigration and Customs Enforcement (ICE) agents. In June 2010, the IJ denied Bazzi's application for adjustment of status and ordered his removal, finding by "clear, convincing and unequivocal evidence" that Bazzi had violated the INA by seeking to procure a visa by fraud. 8 U.S.C. § 1182(a)(6)(C)(i). In particular, the IJ determined that Bazzi misrepresented himself in his visa application as divorced when, in reality, the divorce was a sham calculated to gain admission to the United States. Bazzi timely appealed to the BIA which, reviewing the IJ's findings of fact for clear error and all other findings de novo, dismissed Bazzi's appeal in June 2012. He filed a timely petition for review.

II

When the BIA adds its own language to an IJ's decision instead of simply adopting it, we review the IJ's decision in light of the BIA's additional findings. *See Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005).

We review the IJ's findings, including those regarding the petitioner's credibility, under the substantial-evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 702–703 (6th Cir. 2004). Substantial-evidence review is highly deferential, permitting reversal only if "any reasonable adjudicator would be compelled to conclude to the contrary" which occurs only when the record "not only supports a contrary conclusion, but indeed *compels* it." 8 U.S.C. § 1252(b)(4)(B); *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998). We review the BIA's legal conclusions de novo, with deference to "the BIA's reasonable interpretations of the INA." *See Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005).

In order to support removal, the government bears the burden of establishing, by clear and convincing evidence, that Bazzi is deportable, 8 U.S.C. § 1229a(c)(3)(A), in this case by demonstrating inadmissibility at the time of Bazzi's petition for change of status, 8 U.S.C. § 1227(a)(1)(A). The government can do so on either of the two grounds admitted by Bazzi (immigration document violation or presence without permission) or by a showing that Bazzi willfully misrepresented a material fact in order to procure an immigration benefit, the third charge in the NTA. 8 U.S.C. § 1182(a)(6)(C)(i).

In addition to attempting to rebut the government's evidence in support of deportation, Bazzi continued to pursue his application for adjustment of status. In order for him to succeed, he must prove clearly and beyond doubt that he is not inadmissible as charged. 8 C.F.R. § 1240.8(b). Needless to say, such a showing is impossible should the government succeed in carrying its burden.

Only two of the three alleged grounds for inadmissibility can be waived or avoided: unlawful presence and violation of document requirements, the two grounds admitted by Bazzi. Inadmissibility for unlawful presence, though otherwise ineligible for waiver, has been deemed by the BIA implicitly waived under a narrow exception, possibly not applicable here, by the Legal Immigration Family Equity Act (LIFE Act). 8 U.S.C. § 1255(i). *See Ramirez-Canales v. Mukasey*, 517 F.3d 904, 909–10 (6th Cir. 2008) (finding reasonable the BIA's interpretation of the INA's adjustment provisions

in light of the ambiguity created by seemingly conflicting provisions in the LIFE Act). Inadmissibility for document violations is waivable under 8 U.S.C. § 1182(a)(7)(A)(ii).

In contrast, the third ground, inadmissibility due to fraud or misrepresentation, is not waivable for Bazzi because such waivers can only be granted if the alien is (1) the spouse or child of a citizen or permanent resident and (2) can show that his removal will result in "extreme hardship" to the qualifying relative. 8 U.S.C. § 1182(i). Bazzi's father, the predicate relative for his failed 1989 immigration attempt, died in 1994, leaving Bazzi with no other qualifying relatives and rendering him unable to meet the waiver provision's second requirement. The issue of Bazzi's sham divorce is therefore fully dispositive of his admissibility: if we uphold the IJ's finding of willful misrepresentation of a material fact under substantial-evidence review, Bazzi's petition necessarily fails.

In his petition, Bazzi argues that the ALJ's finding of immigration fraud is not supported by substantial evidence. (Pet'r's Br. 19–20). He also offers the argument that the very concept of a "sham divorce" is not legally cognizable as the basis for the denial of an immigrant visa. (Pet'r's Br. 16–19).

## III

The appeal before us comes down to a single inquiry: was the ALJ's finding of willful misrepresentation of a material fact in pursuit of an immigration benefit supported by substantial evidence?

## A

The IJ found that Bazzi willfully misrepresented a material fact, basing his decision on what could be fairly described as a litany of evidence presented at hearings conducted in July 2009 and February 2010.

To start, there is the evidence that prompted the NTA in the first place: the Tel Aviv consular officer's denial of Bazzi's application for an immigrant visa in 1989. A State Department cable recorded the consular officer's evidence supporting his finding

of sham divorce and his denial of Bazzi's visa. First, during interviews, Bazzi and Adla told conflicting stories regarding the frequency of her visits and the current state of their relationship. Second, Bazzi's sister-in-law informed the embassy that Bazzi's divorce was a sham designed to aid in procuring a visa. Finally, following the consular officer's initial denial of Bazzi's application, the State Department received, reviewed, and discredited additional documentary evidence proffered by Bazzi including an affidavit by Adla, reiterating its finding of a sham divorce and ineligibility for a visa.

Two Immigration and Customs Enforcement (ICE) agents, Keith and Fout, also testified. Agent Keith stated that in July 2009, at 9:00 p.m. the night before the first hearing, the agents conducted an unannounced visit to Adla's house in Michigan, finding evidence that Bazzi resided there, including discovering men's clothing in Adla's bedroom closet. Though Bazzi's son, Jamal, claimed the clothes belonged to him, he admitted that, "a couple of the clothing [*sic*] were his father's," a fact confirmed in interview with another son, Fadel. This evidence directly contradicts Bazzi's own testimony that, "I do not keep extra pants there. I do not keep anything at that residence." In addition, the agents also found medication prescribed to Bazzi and spoke to a neighbor who described Bazzi and Adla as married and living with two adult children. Lastly, Agent Fout ran an address check on Bazzi and Adla which, though not foolproof, indicated that the couple were likely to have shared several addresses in the past. Ultimately, neither of the ICE agents could definitively conclude that Bazzi lived with Adla.

Evidence was also taken from members of Bazzi's family, much of which further cast his truthfulness into doubt. Kathy Bazzi Almi, Bazzi's onetime sister-in-law, claimed that she lied at her then-husband's request when she told the U.S. Embassy in Tel Aviv that the Bazzi's divorce was a sham. Oddly, Almi claimed that she told this lie during a visit to the Embassy rather than by phone as recorded in the State Department cable. Almi also stated that Bazzi was at Adla's house at 9:00 a.m. on the day of the ICE agents' evening visit, contradicting Bazzi's testimony that he visited only once a week to see his children. One of the ICE agents reported that Bazzi's son, Jamal,

during the on-site interview, said that the whole family had dinner every night at Adla's house. Bazzi's story was further cast into doubt by the in-court testimony of two other sons. Fadel stated that they all had dinner together at least "four to five times a week" and Ibrahim, according to the IJ, "vacillated about where the father actually had his dinner, and he gave the court several inconsistent statements . . . ."

Bazzi also raised several arguments in his briefs to rebut the IJ's findings. First, he argued against the IJ's adverse credibility determination by pointing out that much of the testimony concerned events that took place over twenty years ago. (Pet'r's Br. 20). This is true, and Bazzi is right to claim that memories lapse and that the ages of his children make accurate recall less probable. However, the IJ's credibility determination was based, at least in part, on contradictory accounts of contemporary events, for example those regarding Bazzi's daily habits. The Bazzi family's conflicting stories were not, as the petitioner describes them, "slight inconsistencies," but instead were so mutually contradictory as to stand in their own right as evidence that Bazzi and his family were lying.

Finally, the IJ asked Bazzi why he and his wife got a divorce, "and he quite clearly and emphatically said the only reason was I wanted to come to the United States and she did not . . . ." But Mr. and Mrs. Bazzi divorced in 1986. Adla herself then moved to the United States, as an unmarried child of a lawful permanent resident, in 1991, five years after their divorce and two years after Bazzi's failed attempt to procure an immigrant visa. This drastic, unexplained change of heart virtually compelled the IJ to discredit the reason claimed for their divorce.

Simply put, the IJ did not believe Bazzi or the testimony of his family who, as he put it, "just cannot quite keep their story straight." In concluding his decision, the IJ was emphatic: "the contested charge has been sustained by clear, convincing and unequivocal evidence, not to mention, in the Court's view, beyond any doubt whatsoever." The BIA agreed.

In summary, the IJ and BIA found that Bazzi's divorce was a sham, that in putting himself forth as an unmarried child, he willfully misrepresented a material fact,

rendering him inadmissible. As for the instant petition for review, far from compelling us to a contrary decision (as any reversal under substantial evidence review requires), the evidence on the record leads us to conclude that the BIA was quite correct to agree with the IJ in discrediting Bazzi's story and dismissing his appeal.

B

Bazzi's second major argument is that the very concept of the "sham divorce" is itself not a legally cognizable basis for a finding of misrepresentation. Bazzi's argument runs as follows: while there are statutes and regulations addressing "sham marriage," there is no such authority establishing the legal concept of "sham divorce." In the absence of such authority, the Attorney General cannot find immigration fraud when Bazzi did no more than accurately represent himself as having obtained a divorce, something he claims to be "simply a legal status." (Pet'r's Br. 16–19). Additionally, Bazzi contends that the very concept of a "sham divorce" is only a construct of the immigration courts and that since immigration courts have not employed "sham divorce" as a basis for finding immigration fraud, neither should we. (Pet'r's Br. 18–20).

Bazzi's first argument is that the lack of explicit statutory authorization or regulatory guidance for the Attorney General to assess the legitimacy of a sham divorce prohibits such a determination. Unfortunately, this argument pays scant attention to the language of the INA. Bazzi's NTA charged him with immigration fraud. The specific language of the INA is:

> Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

8 U.S.C. § 1182(a)(6)(C)(i). An earlier part of the same section of the INA states: "Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a). In other words, if an alien willfully misrepresents a material fact in applying for a visa, he is inadmissible and thus, absent a waiver

(inapplicable here), is precluded from adjusting his status to that of lawful permanent resident.  8 U.S.C. § 1255(a).

Whether or not "sham divorce" can serve as the basis of a charge of material misrepresentation comes down to a simple, two-part inquiry: did the alien (1) willfully misrepresent (2) a fact that was material.  Willful misrepresentation itself requires no more than "knowledge of the falsity" of facts presented to an immigration officer; unlike fraud, misrepresentation requires no intent to deceive.  *See Parlak v. Holder*, 578 F.3d 457, 463–64 (6th Cir. 2009).  A fact's materiality is determined according to the effect that the fact would have had on the ultimate immigration decision had the truth been known.  *Petkiewytsch v. I.N.S.*, 945 F.2d 871, 881 (6th Cir. 1991) ("[M]ateriality of the misrepresentations is established where the government shows that disclosure of the concealed information probably would have led to the discovery of facts warranting the denial of a visa.").

Here, Bazzi was found to have entered into a sham divorce, which is to say that, while his divorce may have borne the imprimatur of the Republic of Lebanon, he and his wife were not truly divorced.  They continued to conduct their affairs together as man and wife.  Bazzi knew the reality of his marital status and for him to have conveyed any impression to the contrary, let alone to have embellished his story with details of the couple's fictitious estrangement, was to willfully misrepresent the truth.

As to the second part of the inquiry, Bazzi's actual marital status was undoubtedly material.  Bazzi was an adult man and father of six children, a soldier in the South Lebanese Army and an agent for the Mossad who sought immigration as the *unmarried child* of a lawful permanent resident.  *See* 8 U.S.C. § 1153(a)(2) (allocating visas to "[s]pouses and unmarried sons and unmarried daughters of permanent resident aliens").  As the BIA itself said in a case cited by Bazzi, "the intent of Congress in providing for preference status for unmarried sons and daughters of lawful permanent residents was to reunite with their parents unmarried children who, although not minors, were still part of a family unit." *Matter of Aldecoaotalora*, 18 I&N Dec. 430, 431 (BIA 1983).  This most certainly does not describe Bazzi who, at the time of his application,

was a fully independent adult living as a married man and father of six children, regardless of the technical legal status of his marriage. Like the alien in *Aldecoaotalora*, he had not "returned to the family unit of [his] parents" and, like her, his sole reason for getting a divorce was in order to obtain a visa. *Ibid*. Given the BIA's understanding of the Act's purpose in providing these visas, it seems virtually certain that, had the truth of Bazzi's sham divorce been known, he would have been denied the immigration benefit he sought to procure.

As to Mr. Bazzi's second argument, that "sham divorce" is a doctrine limited to the immigration courts, he is simply in error. In 1996, the Supreme Court implicitly recognized sham divorce as a potential basis upon which to deny benefits in the context of immigration law, indeed in the context of immigration fraud. *See I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (articulating the types of entry fraud that the BIA, in its discretion, chose not to consider because they were too remote in time including, "pre-entry and post-entry sham divorces . . . ."); *see also Restrepo v. Holder*, 676 F.3d 10, 15–16 (1st Cir. 2012) (employing sham divorce in evaluating the good moral character of an applicant for immigration benefits). Rather than being, as the petitioner suggests, merely "an invention of the immigration courts," the concept of sham divorce has been recognized in diverse fields of law. (Pet'r's Br. 17–18). *See, e.g., In re Rodgers*, 315 B.R. 522, 533 (Bankr. D.N.D. 2004) (finding against creditor's claim of sham divorce in bankruptcy proceedings).

Sham divorce, if the alien willfully misrepresents the truth and if the alien's genuine marital status is a material fact, can serve as a perfectly legitimate basis for a finding of immigration fraud and attendant inadmissibility under the INA. 8 U.S.C. § 1182(a)(6)(C)(i).

In conclusion, the BIA's finding of immigration fraud by a sham divorce is a legitimate basis for denying admissibility and the BIA's findings were supported by substantial evidence.

IV

For the reasons set forth above, we DENY Bazzi's petition for review.