**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1682**

_____

XING YANG YANG, a/k/a Xing Yang,

                Petitioner,

       v.

ERIC H. HOLDER, JR., Attorney General,

                Respondent.

_____

On Petition for Review of an Order of the Board of Immigration Appeals.

_____

Argued:  September 16, 2014          Decided:  October 29, 2014

Amended:  November 5, 2014

_____

Before MOTZ and KING, Circuit Judges, and DAVIS, Senior Circuit Judge.

_____

Petition for review granted; vacated and remanded by published opinion.  Judge King wrote the opinion, in which Judge Motz and Senior Judge Davis joined.

_____

**ARGUED**: Joshua E. Bardavid, BARDAVID LAW, New York, New York, for Petitioner.  Kerry Ann Monaco, UNITED STATES  DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF**: Eric Y. Zheng, New York, New York, for Petitioner.  Stuart F. Delery, Assistant Attorney General, Civil Division, Linda S. Wernery, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

KING, Circuit Judge:

Xing Yang Yang, a native of China, petitions for review of the May 31, 2013 decision of the Board of Immigration Appeals (the "BIA") affirming the denial of his various applications for relief from deportation (the "BIA Decision").[1]  We grant Yang's petition for review, vacate the BIA Decision, and remand for further proceedings.


                                  I.

As explained below, we ultimately conclude that Yang's petition should be granted because of erroneous inadmissibility rulings, which would preclude Yang from obtaining adjustment of status.  The issues in this proceeding, however, touch on multiple facets of immigration law.  We therefore begin by reviewing relevant aspects of the legal landscape, which has been largely provided by the Immigration and Nationality Act (the "INA") and its implementing regulations.

An alien who enters the United States without required documentation, and who remains present here, is deportable. See 8 U.S.C. §§ 1182(a)(7)(A)(i), 1227(a)(1)(A).  The INA and its regulations offer several avenues by which such an alien may

_____

[1] The BIA Decision is found at J.A. 3-7.  (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this matter.)

seek relief from deportation and lawfully remain in the United States.  Those options and alternatives include awards of asylum and withholding of removal, protection under the Convention Against Torture (the "CAT"), and adjustment of status.

Asylum, withholding of removal, and CAT protection are separate forms of relief, but each prevents an alien from being deported if certain conditions are met.  For example, asylum is generally available to an alien who is a "refugee," meaning that he is "unable or unwilling" to return to his native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. §§ 1158(b)(1), 1101(a)(42).  A "withholding of removal" requires the alien to show a "clear probability" that, if removed to a particular country, his life or freedom would be threatened due to one or more factors, such as race, religion, or political opinion.  Negusie v. Holder, 555 U.S. 511, 541 (2009) (citing 8 U.S.C. § 1231(b)(3)(A)).  The obligations of the United States pursuant to the CAT apply if the alien shows that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).

Adjustment of status is another distinct form of relief, and does not focus on the effects of removal.  Rather, such

3

relief permits the Attorney General, in his discretion, to adjust a deportable alien's status to that of "lawful permanent resident." 8 U.S.C. § 1255.[2] Section 1255 of Title 8 identifies certain grounds for an adjustment of status, including situations where an alien has a spouse or parent — i.e., a "qualified relative" — who is lawfully present in this country; in that circumstance, the qualified relative may petition for an immigration visa on the alien's behalf. Section 1255(i)(1) provides that an alien who has entered the United States without inspection is eligible for adjustment of status if a qualifying relative petitioned for the alien to receive an immigration visa prior to April 30, 2001. If the alien meets those requirements and applies for adjustment of status, the Attorney General may adjust the alien's status "to that of an alien lawfully admitted for permanent residence" if the immigration visa is immediately available and if the alien is otherwise admissible to the United States. Id. § 1255(i)(2).[3]

---

[2] The functions of the Attorney General with respect to immigration issues are largely handled within the Executive Office for Immigration Review (the "EOIR"), an agency of the Department of Justice. See 6 U.S.C. § 521; 8 U.S.C. § 1103(g). The EOIR encompasses the BIA and a host of immigration judges. See 8 C.F.R. §§ 1003.1, 1003.9.

[3] The INA imposes limitations on the number of immigration visas available each year. See 8 U.S.C. § 1151. Additionally, visas are allocated according to preference categories set forth in 8 U.S.C. § 1153. As a result, a delay occurs between a visa (Continued)

4

An alien may be deemed "inadmissible" — and therefore ineligible for an adjustment of status by the Attorney General — for a variety of reasons. Section 1182(a) of Title 8 identifies ten situations where an alien may be inadmissible, relating to issues such as public health, criminal background, and national security. Pursuant to § 1182(a)(4), an alien who seeks an adjustment of status is inadmissible if, at the time he applies for the adjustment, he is likely to become a "public charge." In order to show that the alien will not become a public charge, the qualified relative must submit an affidavit "demonstrat[ing] the means to maintain the intending immigrant at an annual income of at least 125 percent of the Federal poverty line." 8 C.F.R. § 213a.2(c)(2).

An alien who seeks to procure an immigration benefit by "fraud or willfully misrepresenting a material fact" is also inadmissible. 8 U.S.C § 1182(a)(6)(C)(i). That bar to admissibility may be waived, however, in the discretion of the Attorney General, pursuant to § 212(i) of the INA, 8 U.S.C. § 1182(i). Such a "§ 212(i) waiver" requires a showing by the alien that his deportation would cause sufficient hardship to a

---

petition being granted and that visa becoming currently available, as required for an adjustment of status. See id. § 1255(a)(3).

5

qualifying relative, including a spouse or a parent. A § 212(i) waiver is available only to those aliens who have been found inadmissible pursuant to 8 U.S.C. § 1182(a)(6)(C)(i) for seeking an immigration benefit by fraud or willful misrepresentation.

With the foregoing principles in mind, we turn to the background of Yang's petition for review and our analysis of the issues presented therein.

## II.

### A.

Yang entered the United States without inspection on January 20, 1993, and he has since remained here. Yang resides in Maryland, where he has worked at a Chinese restaurant. He has two children who are American citizens, born in Baltimore in 2002 and 2004. Chao Zheng Yang is the mother of Yang's children, and she is not an American citizen. Zheng and Yang have never married.

In March 1993, Yang applied to the INS for asylum and withholding of removal. The Immigration and Naturalization Service (the "INS") initiated removal proceedings against Yang in 1996.[4] On July 23, 1997, Yang was ordered deported in

---

[4] The INS was abolished in 2002, and its enforcement functions were transferred to the Department of Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107–
(Continued)

6

abstentia after failing to appear at a deportation hearing. On March 15, 2001, Yang's mother, Hui Lin, a lawful permanent resident in the United States and qualified relative, petitioned for an immigration visa on Yang's behalf (the "visa petition"). On November 16, 2002, Yang filed an application to alter his status from "without inspection" to that of "permanent resident" (the "adjustment application"), relying on the visa petition his mother had filed in 2001. The visa petition was approved by the INS two years later, on March 5, 2004. In the meantime, Yang filed a motion to reopen his deportation proceedings. Such relief was granted and Yang's deportation proceedings were reopened by the INS on September 9, 2002.

Yang filed yet another application for relief on December 2, 2002, which he supplemented approximately four years later, on July 17, 2007 (collectively, the "asylum application"). Therein, Yang sought three types of relief — asylum, withholding of removal, and protection under the CAT. Yang identified three supporting grounds for the asylum application. First, he relied on his past political activities in China, asserting that, in 1989, "I was involved in the student[] movement and participated

---

296, § 441, 116 Stat. 2135, 2192. For simplicity, we refer herein to all the immigration enforcement authorities as the "INS."

7

in the demonstration in Beijing[,] China with my classmates." J.A. 1663. If he returned to China, Yang feared harm from the Chinese government based on his earlier political participation. Second, Yang asserted that he was associated with the Falun Gong group, which had been persecuted by the Chinese government. Third, Yang raised concerns about China's one-child policy, given that he already had two children and might have more.

B.

On June 5, 2008, an immigration judge (the "IJ") conducted an evidentiary hearing on Yang's asylum application (the "Initial IJ Hearing"). Before evidence was received, the IJ instructed Yang and his counsel to review the asylum application for errors. Upon review, Yang made one correction, crossing out a statement that he had been arrested during the student movement in China. Yang explained to the IJ that a "travel service" had assisted with his immigration paperwork, because he did not speak English. See J.A. 1284-85. Yang had described his immigration claims to the travel service, and the service had completed Yang's asylum application forms. Yang failed to carefully review the paperwork before he signed it, but believed the asylum application forms properly reported the information he had provided to the travel service.

As Yang began to testify in the Initial IJ Hearing, the IJ inquired about papers Yang carried to the witness stand. Yang

8

explained that the papers contained notes about his testimony, and the IJ instructed that he hand them to his attorney. Yang then testified as follows: He was a college student during China's student democracy movement in 1989. Yang took part in a "demonstration parade" in Fuzhou, shouting slogans in support of the student protests then taking place in Tiananmen Square in Beijing. Following those events, Chinese government officials came to Yang's home on several occasions to investigate his involvement with the democracy movement.

Yang further advised the IJ that his children lived with him. If deported, he would be compelled to take the children — both American citizens — to China because no one in the United States would care for them. Lin watched Yang's children while he was at work, and Zheng was "nowhere to be found." J.A. 1273. Indeed, Yang had not known her whereabouts for two years.

Finally, Yang testified that he "had contact with" Falun Gong, but was not a member of that group. J.A. 1296. Yang clarified that Falun Gong was not relied on as a basis for his asylum claim, and that references to the group in his asylum application had been mistakenly included.

Lin (Yang's mother), who was sequestered outside the hearing room during Yang's testimony, then took the witness stand. Before Lin answered questions, the IJ twice instructed Yang not to communicate with her. Lin then testified that she

9

lived with her daughter in New York. Immediately thereafter, Lin said that she lived in Maryland, but had previously lived in New York. More specifically, Lin stated that she lived in Yang's Maryland home with Yang, his children, and Zheng. In addition to indicating that Zheng lived in Yang's home, Lin said that Zheng and Yang worked at the same restaurant. When asked if she had any idea why Yang had testified that Zheng was "nowhere to be found," Lin replied, "Right now, she is nowhere to be found." J.A. 1309. Lin said that Zheng had left "a while ago," but did not otherwise seek to explain the conflicts regarding Zheng's whereabouts. Id.

A Mandarin interpreter provided English translations during Yang's and Lin's testimony. While Lin was testifying, the interpreter interrupted repeatedly because of difficulties communicating with Lin. See J.A. 1305, 1307, 1312-14, 1316-21. The interpreter explained to the IJ that he was having trouble with Lin's testimony because "[Lin] does not speak Mandarin." Id. at 1316. The interpreter also suggested that Lin required a Fuzhou — rather than the Mandarin — interpreter.[5] Yang's

---

[5] Fuzhou and Mandarin are separate languages used in China. Fuzhou is widely used in part of the Fujian province, the area surrounding Fuzhou, the provincial capital. See James Blatt, Recent Trends in the Smuggling of Chinese into the United States, 15 Williamette J. Int'l L. & Disp. Resol. 227, 235-36 (2007). Fujian is located in southeast China, across from (Continued)

lawyer, however, maintained that a Mandarin interpreter was appropriate. In light of that conflict, the IJ questioned the interpreter about the accuracy of his translations. The interpreter advised that he had accurately translated Lin's testimony, except where he indicated that it needed clarification.[6]

### C.

On September 4, 2008, the IJ disposed of the adjustment application and the asylum application by oral decision (the "Initial IJ Decision").[7] The IJ first decided that Yang was not eligible for an adjustment of status because his visa petition was not currently available. The IJ then rendered an adverse credibility determination (the "credibility ruling"), explaining that "this is a case in which [Yang] cannot rely on testimony

---

Taiwan. Id. at 235. Mandarin, the official language of China, is used in most of northern China. Id. at 236 n.37.

[6] Yang was represented by the same lawyer during all proceedings before the IJ. The record readily reveals issues concerning whether the lawyer provided effective assistance to Yang, including the lawyer's apparent failure to insist on an appropriate interpreter. The BIA has recognized that "[i]neffective assistance of counsel in a deportation proceeding is a denial of due process." Matter of Lozada, 19 I. & N. Dec. 637, 638 (B.I.A. 1988). Because Yang did not pursue an effective assistance claim to the BIA, however, we lack jurisdiction to consider any such issues. See 8 U.S.C. § 1252(d)(1); Kporlor v. Holder, 597 F.3d 222, 226 (4th Cir. 2010).

[7] The Initial IJ Decision is found at J.A. 1102-23.

11

alone" to establish his eligibility for asylum, and that "[h]e needs corroborative information to support his claim." Initial IJ Decision 17. In support of the credibility ruling, the IJ found that Yang's demeanor undermined his credibility, observing that Yang "took notes with him to the witness stand, and appeared to be referring to those notes during the course of his testimony." Id. at 15. The IJ further noted that Yang "twice signaled his witness, once before she took the witness stand, and once while she was testifying." Id. According to the IJ, after Lin testified that Zheng was living in Yang's home, Yang had signaled to Lin. Lin then claimed that Zheng was "nowhere to be found."[8] The IJ identified other inconsistencies between the asylum application and the evidence at the Initial IJ Hearing, related to whether Yang went to Beijing to participate in the Tiananmen Square protests; whether he actively practiced Falun Gong; the whereabouts of Zheng, and, consequently, whether

_____

[8] Although the Initial IJ Decision noted that Yang twice signaled to Lin during the Initial IJ Hearing — including once while she was testifying about Zheng's whereabouts — there is nothing in the hearing transcript that reflects any such signaling. Moreover, with respect to the IJ's observation that Yang appeared to refer to notes "during the course of his testimony," see Initial IJ Decision 15, the transcript shows that Yang gave the papers to his lawyer very early in his testimony, after he answered four questions about his address, when he left China, when he arrived in the United States, and his reason for leaving China, see J.A. 1266.

12

Yang's children would return to China with him; and where Lin currently lived.

After announcing the credibility ruling, the IJ determined that Yang had failed to submit sufficient corroborating evidence to establish his asylum claim. The IJ similarly denied Yang's request — which carried a higher burden of proof — for withholding of deportation. Addressing the CAT claim, the IJ concluded that Yang had not presented credible evidence regarding his past political activities or the likelihood that he would face torture in China.

Yang promptly appealed the Initial IJ Decision to the BIA, contending that the IJ erred in denying his asylum application. While that appeal was pending, the visa petition filed on Yang's behalf by Lin, as his qualifying relative, became current, rendering Yang eligible for an adjustment of status as of July 2009. Consequently, on February 1, 2010, the BIA remanded the proceeding to the IJ with instructions that Yang be afforded the opportunity to seek adjustment of status. The BIA deferred consideration of Yang's appeal of the Initial IJ Decision insofar as it related to the denial of his asylum application.

D.

Following the BIA's remand, a master calendar hearing was convened by the IJ on April 19, 2010. Noting the credibility ruling that had thwarted Yang's asylum application, the IJ

13

"strongly encourage[d]" Yang to pursue a § 212(i) waiver in connection with his adjustment application. See J.A. 530; see also 8 U.S.C. § 1182(a)(6)(C)(i) (rendering inadmissible an alien who seeks to procure an immigration benefit by "fraud or willfully misrepresenting a material fact"); id. § 1182(i) (authorizing Attorney General to grant § 212(i) waiver to alien deemed inadmissible under § 1182(a)(6)(C)(i)). Thereafter, on July 14, 2010, Yang filed his application for a § 212(i) waiver with the Attorney General (the "waiver application").

On March 17, 2011, the IJ conducted a merits hearing on Yang's adjustment and waiver applications (the "Second IJ Hearing"). Yang, the sole witness, testified as follows: His mother, Lin, was then sixty-six years old and unable to hold a steady job. Yang's children and Lin depended entirely on Yang financially. Zheng was "gone," although she visited occasionally. See J.A. 557. Zheng had visited Yang and the children in February 2011 during the Chinese New Year. Yang had spoken with Zheng only once — by phone — since that visit, concerning the children's health and education. They had not discussed what would happen to their children if Yang had to return to China. Yang confirmed that he and Lin cared for the children, and asserted that, if Yang were deported, Lin would be forced to obtain government assistance. The children would then

14

struggle to survive because no one would be available to care for them.

After hearing Yang's evidence, the IJ recessed to deliberate before rendering her oral ruling. When the Second IJ Hearing reconvened on March 17, 2011, Yang and his counsel were not present. Nevertheless, the IJ proceeded to issue her oral decision, denying Yang's adjustment and waiver applications (the "Second IJ Decision").[9]

The Second IJ Decision denied Yang's adjustment application on three bases. First, the IJ ruled that Yang had abandoned the application because he failed to maintain current biometric data, including fingerprinting, and, alternatively, because Yang was not present for the IJ's oral decision. See 8 C.F.R. § 1003.47. Second, the IJ ruled that Yang was inadmissible as a public charge because his income fell below the poverty line. See 8 U.S.C. § 1182(a)(4). Third, the IJ determined that Yang was inadmissible on a separate and distinct ground; that is, he had engaged in fraud and willful misrepresentation to procure an immigration benefit, and was thus ineligible for adjustment of status pursuant to 8 U.S.C. § 1182(a)(6)(C)(i) (the "willful misrepresentation ruling"). The IJ justified the willful misrepresentation ruling by invoking the Initial IJ Decision's

---

[9] The Second IJ Decision is found at J.A. 412-29.

15

credibility ruling. The IJ also noted that, following the BIA's remand order of February 2010, Yang could have explained the inconsistencies that led to the credibility ruling, but had declined that opportunity.

Having found Yang inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i), the IJ proceeded to determine that Yang did not warrant a § 212(i) waiver of that inadmissibility ruling. First, the IJ exercised discretion to deny the § 212(i) waiver based on the willful misrepresentation ruling. The IJ then alternatively concluded that Yang failed to satisfy the legal requirements for a § 212(i) waiver, in that he had not shown that Lin would suffer an extreme hardship. As a result, the Second IJ Decision ordered Yang removed to China.

E.

On April 6, 2011, Yang appealed the Second IJ Decision to the BIA, where his appeal from the Initial IJ Decision remained pending. Yang also moved the BIA to remand for a new IJ hearing on his adjustment and waiver applications. In support of the remand request, Yang submitted Lin's medical records, asserting that her health problems, as demonstrated by those records, created a sufficient hardship to Lin to satisfy the requirements for a § 212(i) waiver. Alternatively, Yang contended that he did not need any such waiver because he had not engaged in fraud or willful misrepresentation in seeking an immigration benefit.

16

Further, Yang submitted his 2011 tax returns as new evidence that showed increased income and thus that he was no longer inadmissible as a public charge. Finally, Yang maintained that he had not abandoned his adjustment application.

The BIA Decision rejected Yang's appeals of the Initial IJ Decision and the Second IJ Decision, and also denied his motion to remand. First, the BIA affirmed the Initial IJ Decision with respect to Yang's asylum application. The BIA explained that the credibility ruling was not clearly erroneous because of Yang's demeanor during the Initial IJ Hearing, as well as "major inconsistencies" in his asylum application and testimony. BIA Decision 2. Agreeing that Yang "failed to meet the burden of proof for asylum," the BIA ruled that Yang could not "satisfy the more stringent clear probability standard required for withholding of removal." Id. at 5. Further, the BIA affirmed the Initial IJ's Decision that Yang had failed to show that he would more likely than not be subject to torture if returned to China.

Turning to the Second IJ Decision, the BIA Decision affirmed the IJ's denial of Yang's adjustment and waiver applications. The BIA agreed that Yang had abandoned the adjustment application by failing to maintain current biometric

17

data.[10]   With respect to the merits of the IJ's willful misrepresentation ruling that made Yang inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i), the BIA emphasized that the IJ had previously "rendered a detailed adverse credibility finding," which the BIA did not deem clearly erroneous.  BIA Decision 2. Although the IJ premised the willful misrepresentation ruling on her determination that Yang had engaged in both fraud and willful misrepresentation, the BIA focused only on willful misrepresentation in affirming the IJ.[11]   Finally, the BIA affirmed the Second IJ Decision's conclusion that Yang did not qualify for a § 212(i) waiver of inadmissibility because he had not shown "that his removal would result in extreme hardship to his lawful permanent resident mother."  Id. at 3.

The BIA Decision also denied Yang's motion to remand to consider additional evidence on his adjustment and waiver applications.  The BIA considered the evidence that Yang submitted as new and previously unavailable, including his 2011

---

[10] The Second IJ Decision concluded that Yang abandoned his adjustment application on two separate grounds:  failing to maintain current biometric data and failing to appear for the continuation of the Second IJ Hearing.  The BIA Decision did not address the IJ's second basis for the abandonment ruling.

[11] As we explain in greater detail infra, under 8 U.S.C. § 1182(a)(6)(C)(i), fraud requires that an alien intended to deceive, while willful misrepresentation requires only that the alien deliberately and voluntarily misrepresented a material fact.

18

tax returns and the medical records of Lin. The BIA deemed the tax returns — but not Lin's medical records — to be new and previously unavailable, and thus proper for consideration. Nevertheless, the BIA concluded that, because Yang was inadmissible due to the willful misrepresentation ruling in addition to insufficient income, the 2011 tax returns did not warrant a remand. Therefore, the BIA denied Yang's remand motion.

Yang has petitioned for our review of the BIA Decision, and we possess jurisdiction pursuant to 8 U.S.C. § 1252.

## III.

Where, as here, the BIA has adopted an IJ decision and issued its own decision, we review both rulings. See Jian Tao Lin v. Holder, 611 F.3d 228, 235 (4th Cir. 2010). The BIA's determination that "an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). We review legal issues de novo. See Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011). We review an IJ's findings of fact for substantial evidence, accepting such findings as conclusive unless a reasonable adjudicator would have been compelled to reach a different conclusion. See id.

19

IV.

In challenging the BIA Decision by his petition for review, Yang focuses on the Second IJ Decision's denial of his adjustment and waiver applications. Specifically, Yang maintains that he should not have been found inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i), because the IJ's willful misrepresentation ruling was legally and factually improper. Yang alternatively contends that Lin's medical records are new evidence that should be considered in support of his waiver application. Finally, Yang argues that, because the INS failed to provide notice of its requirement for updated biometric data, he did not abandon his adjustment application by flouting that requirement. For those reasons, Yang urges that this matter be remanded.

A.

We begin with Yang's contention that the BIA Decision erred in affirming the Second IJ Decision's determination that he is inadmissible under § 1182(a)(6)(C)(i) for having made willful misrepresentations to procure an immigration benefit. That willful misrepresentation ruling was predicated on the Initial IJ Decision's credibility ruling. As explained below, the IJ thereby utilized an erroneous legal standard in rendering the willful misrepresentation ruling. Furthermore, applying the proper legal principles, the willful misrepresentation ruling is

20

not supported by substantial evidence.  We now turn to those points in further detail.

1.

An adverse credibility ruling impacts the evidence an alien must produce in order to meet his burden in proving eligibility for asylum.  See Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011).  The INA provides that an alien may establish an asylum claim through testimony alone — without corroborating evidence — if the trier of fact finds the alien's testimony to be credible and persuasive.  See 8 U.S.C. § 1158(b)(1)(B)(ii).  The trier of fact may predicate a credibility determination on factors such as "the demeanor, candor, or responsiveness" of the alien and his witnesses, the consistency between oral testimony and written statements, and the internal consistency of the evidence.  Id. § 1158(b)(1)(B)(iii).  Under applicable law, "[m]inor omissions, inconsistencies, and contradictions that do not go to the heart of the applicant's claims . . . do not necessarily support an adverse credibility determination." Djadjou, 662 F.3d at 274.  As a result, "if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility."  Ceraj v.

Mukasey, 511 F.3d 583, 591 (6th Cir. 2007) (internal quotation marks omitted).[12]

Meanwhile, a willful misrepresentation ruling impacts whether an alien is admissible to the United States. The INA provides that an alien is inadmissible — and thus ineligible for adjustment of status — if he "by fraud or willfully misrepresenting a material fact, seeks to procure" an immigration benefit. 8 U.S.C. § 1182(a)(6)(C)(i). The government bears the burden of showing, by clear and convincing evidence, that the alien fraudulently or willfully misrepresented or concealed some material fact, and that such fraud or misrepresentation was used to seek a visa, documentation, or entry into this country. See Ortiz-Bouchet v. U.S. Attorney General, 714 F.3d 1353, 1356 (11th Cir. 2013); Atunnise v. Mukasey, 523 F.3d 830, 835 (7th Cir. 2008); Monter v. Gonzalez, 430 F.3d 546, 553-55 (2d Cir. 2005); Mwongera v. INS, 187 F.3d 323, 330 (3d Cir. 1999); Forbes v. INS, 48 F.3d 439, 441-43 (9th Cir. 1995). Courts interpret fraud and willful

---

[12] The legal standard applicable in these proceedings was modified by the REAL ID Act of 2005, which now authorizes an IJ to base credibility determinations on any inconsistency "without regard to whether [it] goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). The REAL ID Act does not apply here, however, because Yang's asylum application was filed prior to the effective date thereof. See Marynenka v. Holder, 592 F.3d 594, 600 n.* (4th Cir. 2010).

misrepresentation as constituting two separate bases for inadmissibility. Fraud requires that the alien intended to deceive, while willful misrepresentation requires no such intent. See Parlak v. Holder, 578 F.3d 457, 463 (6th Cir. 2009). Rather, a misrepresentation is willful if it was deliberate and voluntary. See In re D-R-, 25 I. & N. Dec. 445, 451 n.3 (B.I.A. 2011). Knowledge of the falsity of the representation generally satisfies that standard. See Mwongera, 187 F.3d at 330.

Adverse credibility and willful misrepresentation also are distinct legal concepts, requiring separate analyses. See Singh v. Gonzales, 413 F.3d 156, 161 (1st Cir. 2005) ("[A] negative credibility finding alone is not the equivalent of a finding of willful misrepresentation and the one does not necessarily lead to the other."). An adverse credibility determination can properly be rendered without any deliberate and voluntary misrepresentation, but a determination that an alien made a willful misrepresentation requires that those specific elements be shown. Thus, the courts of appeals have consistently recognized that "inconsistencies between a petitioner's asylum application and hearing testimony, as well as internal inconsistencies between a petitioner's asylum application and hearing testimony, may not equate to willful misrepresentations." Falaja v. Gonzales, 418 F.3d 889, 898 (8th

23

Cir. 2005); see also Oforji v. Ashcroft, 354 F.3d 609, 612 (7th Cir. 2003).

Here, however, the Second IJ Decision based the willful misrepresentation ruling solely on the credibility ruling, applying an erroneous legal standard. The IJ failed to articulate any of the requirements that must be shown by clear and convincing evidence in order to apply 8 U.S.C. § 1182(a)(6)(C)(i), including the intent to deceive required for fraud, or the deliberateness and voluntariness necessary for willful misrepresentation. Rather, after recounting the inconsistencies on which the credibility ruling was based, the IJ simply stated:

> [T]he Court perceives that these unexplained material inconsistencies are a reflection of [Yang's] efforts at fraud, and that they are reflections of willful misrepresentations of fact that were offered up in an effort to gain the benefits of asylum and withholding.

Second IJ Decision 4-5. In sum, the IJ conflated adverse credibility with fraud and willful misrepresentation, thereby committing legal error.

The BIA Decision did acknowledge relevant law, recognizing — without discussing fraud — that a willful misrepresentation can be shown "by a finding that the misrepresentation was deliberate and voluntary." BIA Decision 3 (internal quotation marks omitted). But while the BIA recounted the correct legal standard for willful misrepresentation, it did not actually

24

apply that standard in affirming the IJ's willful misrepresentation ruling. The BIA reasoned that the IJ determined that Yang's "unexplained inconsistencies constituted willful misrepresentations to gain the immigration benefits of asylum and withholding or removal, and we discern no clear error in this finding." Id. Given that the IJ's willful misrepresentation ruling was rendered by erroneously equating adverse credibility with willful misrepresentation, the BIA repeated the IJ's legal error in affirming the Second IJ Decision.

2.

The BIA Decision further erred in affirming the Second IJ Decision because, under the proper legal standard, the record lacks substantial evidence to support the willful misrepresentation ruling. In making that ruling, the IJ simply relied on her earlier credibility ruling, pronouncing that the inconsistencies in Yang's asylum application and evidence, coupled with his demeanor, were "a reflection of efforts at fraud and . . . reflections of willful misrepresentations of fact." Second IJ Decision 4-5. The IJ failed to specify what evidence established the "fraudulent" or "willful" nature of Yang's inconsistencies.

To be sure, a comparison of Yang's asylum application and his Initial IJ Hearing testimony shows contradictory statements

25

about whether Yang actually went to Tiananmen Square and whether he was relying on Falun Gong in seeking relief from removal. The record does not reveal evidence, however, that Yang made knowing and deliberate misrepresentations to gain an immigration benefit. Yang's testimony was not only internally consistent, but to the extent it contradicted his asylum application, the testimony weakened his position. That is, Yang testified that he did not travel to Tiananmen Square and that he was not basing his application on Falun Gong. While that testimony contradicted statements made in the asylum application, the testimony would seem to completely undermine the notion that Yang attempted to use misrepresentations to procure an immigration benefit. Moreover, Yang explained that he had difficulty completing and reviewing the application forms because of the language barrier. Accordingly, the record does not contain clear and convincing evidence that Yang attempted to procure an immigration benefit by deliberately and voluntarily making false statements regarding Tiananmen Square and Falun Gong.

As for the two other inconsistencies upon which the willful misrepresentation ruling relied — the current residence of Lin and the whereabouts of Zheng — those also fail to support the ruling. Even assuming that Yang deliberately and voluntarily made misrepresentations about those points, it is not clear that

26

either misrepresentation was material to the claims raised in the asylum application. The IJ made the conclusory remark that those inconsistencies were "material" and "were offered up in an effort to gain the benefit of asylum and withholding." Second IJ Decision 4-5. To be material, however, a misrepresentation must be of the sort that would affect the ultimate immigration decision. See Bazzi v. Holder, 746 F.3d 640, 645-46 (6th Cir. 2013). Although the residence of Lin and whereabouts of Zheng may have been relevant to the question of whether Yang's children would accompany him to China, that was not a question on which Yang's asylum and withholding claims pivoted. To prevail on those claims, Yang needed to show that the children's presence in China would subject him to enforcement of the one-child policy. Indeed, the Initial IJ Decision recognized as much, denying the asylum claim because "the evidence in the record does not demonstrate that the Chinese government would require forced sterilization of [Yang] as a penalty for returning with two children born in the United States." Initial IJ Decision 19 (relying on BIA's precedent of In re J-W-S-, 24 I. & N. Dec. 185 (B.I.A. 2007), as being "on all four squares"). Accordingly, there is not clear and convincing evidence that the inconsistencies about Lin's residence and Zheng's whereabouts were material to Yang's asylum application, as would be necessary to justify the willful misrepresentation ruling.

27

The lack of substantial evidence supporting the willful misrepresentation ruling in this matter is highlighted by reference to other proceedings where substantial evidence was present that the petitioners deliberately and voluntarily made false representations material to their claims. For example, the Sixth Circuit affirmed a determination of willful misrepresentation where the alien: failed to disclose a prior arrest and conviction in Turkey; provided a falsely translated newspaper article that omitted information that the alien had been tried for killing two soldiers; and reported that he had been sentenced to death, while failing to reveal that the sentence had been reduced and his conviction was being appealed. See Parlak, 578 F.3d at 465. The Second Circuit concluded that an alien who used a false surname and offered false information so as to misrepresent her eligibility for a non-immigrant visa had made willful misrepresentations. See Emokah v. Mukasey, 523 F.3d 110, 117-18 (2d Cir. 2008). And the First Circuit ruled that an alien made willful misrepresentations when he represented that he had never been married and had no children, both of which were patently false statements. See Toribio-Chavez v. Holder, 611 F.3d 57, 63 (1st Cir. 2010). The evidence in our record offers considerably less support that Yang made deliberate and voluntary misrepresentations to procure an immigration benefit.

28

We emphasize that a willful misrepresentation must be shown by clear and convincing evidence in order to render an alien inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i). The record here lacks substantial evidence that would support such a determination. Accordingly, the Second IJ Decision erred in determining that Yang is inadmissible under § 1182(a)(6)(C)(i), and the BIA erred in affirming in that respect.

3.

Given that Yang is not inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i), he has no need for a § 212(i) waiver. Yang's contention that the BIA should have remanded for consideration of new evidence in support of his waiver application is therefore moot.

B.

Finally, we cannot agree with the IJ's conclusion, which the BIA affirmed, that Yang abandoned his adjustment application by failing to submit updated biometric data, as required by 8 C.F.R. § 1003.47. Indeed, the Attorney General conceded at oral argument in this appeal that the record contained no evidence that the INS complied with its legal obligation to "notify the respondent of the need to provide biometrics and other biographical information and [to] provide a biometrics notice and instructions to the respondent for such procedures." See 8

29

C.F.R. § 1003.47(d).  We readily accept the Attorney General's candid concession in that respect.

V.

Pursuant to the foregoing, we grant Yang's petition for review and vacate the BIA Decision.  We remand to the BIA for such further proceedings as may be appropriate.

PETITION FOR REVIEW GRANTED;
VACATED AND REMANDED
