**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1365**

---

BASSAM GERGES HANNA,

        Petitioner,

     v.

LORETTA E. LYNCH, Attorney General,

        Respondent.

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Argued:  March 22, 2016          Decided:  April 12, 2016

---

Before WYNN and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

---

Petition for review denied by unpublished opinion.  Senior Judge Davis wrote the opinion, in which Judge Wynn and Judge Diaz concurred.

---

**ARGUED**: Soulmaz Taghavi, FAYAD LAW, PC, Henrico, Virginia, for Petitioner.  Alison Marie Igoe, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF**: Tamar Jones, FAYAD LAW, PC, Richmond, Virginia, for Petitioner.  Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Christopher C. Fuller, Deputy Chief, National Security Unit, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Senior Circuit Judge:

Following a removal hearing, an immigration judge ("IJ") found Petitioner Bassam Gerges Hanna, a national of Lebanon and a permanent resident of the United States, removable for being inadmissible at the time of his adjustment of status under Section 237(a)(1)(A) of the Immigration and Nationality Act ("INA") (codified at 8 U.S.C. § 1227(a)(1)(A)), and for committing marriage fraud under Section 237(a)(1)(G)(ii) of the INA (codified at 8 U.S.C. § 1227(a)(1)(G)(ii)). In this timely petition for review, Hanna argues that the IJ erred in three distinct respects: (1) in finding that the government satisfied its burden of proving removability by clear and convincing evidence; (2) in depriving him of due process insofar as the IJ admitted into evidence a sworn statement by his ex-spouse while not procuring the ex-spouse's presence at the removal hearing, thereby failing to make her available for cross-examination; and (3) in excluding evidence bearing on the government's alleged motive in seeking his removal. We discern no error and deny the petition for review.

I.

Hanna originally entered the United States from Lebanon in 1985 as a B-2 non-immigrant for pleasure. Beginning in 1994, Hanna operated a convenience store and then worked in used car

3

sales in North Carolina. On May 15, 2001, Hanna married Amy Williford at a Raleigh, North Carolina courthouse.

The dispositive factual and legal issue at the removal hearing before the IJ was whether the government proved by clear and convincing evidence that the marriage was fraudulently entered into in order to provide Hanna with an immigration benefit. The IJ so found in a comprehensive written opinion, and the Board of Immigration Appeals ("BIA") sustained the IJ's conclusion. The conflicting evidence bearing on the question is summarized below.

A.

The government sought to make its case for removability by calling two witnesses, Hanna and Department of Homeland Security ("DHS") Agent Christopher Brant, coupled with the introduction of several exhibits, including numerous documents from Hanna's immigration file that had been executed by Hanna and Williford. Hanna offered his own testimony, together with affidavits from three of his friends who affirmed they spent time with the couple during the marriage, in support of his contention that his marriage to Williford was entirely bona fide, if troubled. In its totality, the testimonial and documentary evidence tended to establish the following factual and procedural course of events.

4

1.

In 2008, as part of a larger money laundering investigation, Agent Brant commenced an investigation into the export of certain vehicles to Africa and the Middle East, focusing on the principals, including Hanna, of an enterprise known as Cary Auto Sales located in Cary, North Carolina. While reviewing Hanna's immigration records, Agent Brant discovered a "tip line call" from January 23, 2007, indicating that Hanna might have engaged in marriage fraud. Upon Agent Brant's review of Hanna's and Williford's motor vehicle records, his suspicions were aroused when he compared the address changes in Williford's DMV records with the dates and addresses reported in documents from Hanna's immigration file. Specifically, Agent Brant uncovered two inconsistencies. First, he noticed that Williford had changed her claimed addresses to Hanna's addresses days prior to Hanna's immigration interviews, and then had changed her addresses to her mother's addresses following the interviews. Agent Brant had seen this behavior in other cases, and it was indicative of fraud. Second, when Williford was charged with speeding in February 2003, during a period when she and Hanna were ostensibly living together, she gave law enforcement officers her mother's address in Siler City, North Carolina.

Agent Brant sought to question Williford about the apparent discrepancies. Williford originally declined to speak with him, but she later agreed to do so with her lawyer present. In a sworn statement, Williford confessed to Agent Brant that she had married Hanna for financial remuneration in return for assisting Hanna with his immigration status.[1] Regarding Williford's admissions to Agent Brant contained in the statement he took from her, Hanna testified at the removal hearing that Williford, believing he was very wealthy, had demanded $1,000,000 from him, which he had refused to pay. Therefore, he surmised, she had provided the statement to Agent Brant as a form of revenge.

2.

The details of Williford's motor vehicle record, as well as Hanna's immigration file and removal hearing testimony, ultimately justified Agent Brant's suspicions. In a 2001 biographic information form from his immigration file, Hanna had

---

[1] In her sworn statement, Williford attested that the statement was true and was being given freely and voluntarily. She stated that the wedding was witnessed by two strangers who were also getting married at the courthouse. There were no pictures and, while her mother knew about the wedding, her father did not. She stated that she and Hanna did not go on a honeymoon and did not consummate the marriage. Hanna paid her $1,000 at the time of the wedding and $1,000 at the time of the divorce, and he also gave her a 1989 Honda Accord. She stated that she had married Hanna for the money and to assist him in adjusting his immigration status. The couple never lived together.

stated that he lived in Madison, New Jersey, from January 2001 to May 2001. This assertion arguably conflicted with Hanna's removal hearing testimony that he and Williford had dated for several months in early 2001 in North Carolina, just prior to their May 2001 wedding. On August 14, 2001, soon after the wedding, Williford filed a Form I-130 Petition for Alien Relative with U.S. Citizenship and Immigration Services ("USCIS"), seeking a visa for Hanna on the basis that he was now a relative of a U.S. citizen. In the I-130 petition, Williford asserted that she and Hanna lived together on West Skylark Drive in Cary, North Carolina. She had changed her address at the DMV to West Skylark Drive two months prior to filing the I-130 petition. On September 24, 2001, Hanna filed a Form I-485 Application to Register Permanent Resident or Adjust Status with the USCIS. In the I-485 application, Hanna asserted that he qualified for permanent resident status because he was married to a U.S. citizen and Williford's I-130 petition had been approved. He also asserted, falsely, that he had never been charged with any crimes, as he had in fact been convicted of larceny. In March 2002, just six months after Hanna filed the I-485 application, Williford changed her address at the DMV to her mother's home on Derry Down Lane in Apex, North Carolina.

During a USCIS interview near the middle or end of 2002, Hanna had denied any criminal convictions. At the removal

7

hearing, Hanna testified that he was unaware that he had not disclosed the criminal charges in the I-485 application; he thought that he had provided his criminal record to be added to his immigration file but did not recall when. He also stated that he and Williford lived together on Shady Meadow Circle in Cary, North Carolina. According to her DMV records, Williford changed her address to Shady Meadow Circle two days before the interview. In March 2003, just a few months after the interview, Williford changed her address again to her mother's new house in Siler City, North Carolina. That change was consistent with a speeding ticket that Williford received in February 2003, which also listed her mother's Siler City address.

During the removal hearing, Hanna addressed Williford's frequent address changes, testifying that Williford lived with her mother while they dated, but that he and Williford lived together most of the time during the marriage. Williford would frequently leave their home following arguments to live temporarily at her mother's home, sometimes for weeks or months at a time.

Other evidence further indicated an atypical matrimony. According to Hanna's removal hearing testimony, he met Williford in 1996 as his convenience store, called Cary Beverage, was located next to a mechanic shop operated by Williford's aunt and uncle. He and Williford started dating in early 2001 and had

8

dated for three or four months by the time they wed, but they "really did not get officially engaged." A.R. 141. He asked her to marry him in or about February or March 2001. No friends or family accompanied them to the courthouse for the wedding because, although Williford's mother offered to come, members of his own family could not come and so he told Williford's mother not to attend. He testified that he married Williford because he loved her and denied that he offered to pay Williford for the marriage. They bought their wedding rings at the mall and then honeymooned in Myrtle Beach a few weeks after the wedding.

During the marriage, Hanna made eight trips to Lebanon, most of them for more than four weeks; Williford did not join him on any of the trips because, according to Hanna, she was unnerved by the war in Lebanon. Williford never met Hanna's parents but had spoken to them by telephone, and she knew Hanna's two brothers who lived in North Carolina.

According to Hanna's removal hearing testimony, in March 2006, Williford told Hanna that she wanted a divorce. Hanna filed for divorce employing a lawyer selected by Williford, but Williford did not respond to or appear in the divorce proceedings. When Hanna signed the divorce paperwork at the lawyer's office, and when the divorce was granted in October 2006, he affirmed that he and Williford had been separated for a year. In other words, he affirmed that they had been separated

since at least October 2005 and not only as of March 2006. In addressing this apparent inconsistency, Hanna testified at the removal hearing that he did not know that he had affirmed they had been separated for a year because he signed the divorce documents without reading them.

On July 25, 2007, Hanna filed a second N-400 Application for Naturalization (the first having been denied). In the 2007 application, Hanna asserted that he had lived on Buckland Mills Court in Cary, North Carolina, since June 2006, and that he had lived there with his wife until she moved out before the divorce, statements that compounded the earlier discrepancies about Williford's address and their date of separation. He also disclosed his 1995 misdemeanor larceny conviction. Consequently, his second N-400 application was denied on the ground that he had failed to disclose the conviction on his earlier I-485 application and falsely testified that he had never been convicted of a crime during his adjustment interview in October 2002.

B.

On September 29, 2011, based on Agent Brant's findings, the DHS served Hanna with a notice to appear, charging him with being inadmissible at the time of adjustment of immigration status under Section 237(a)(1)(A) and marriage fraud under Section 237(a)(1)(G)(ii). Because Hanna denied that he had

10

entered into a fraudulent marriage, a contested removal hearing was held before an IJ on April 5, 2013.

Prior to the removal hearing, Hanna filed a motion in limine seeking to admit evidence that the removal proceedings were initiated in bad faith and only because the DHS and the Department of Justice had failed in several attempts to charge him with terrorism related activity. He also wished to show that Williford's sworn statement was coerced or motivated by revenge. The IJ denied the motion in limine, concluding that there was no evidence of "malfeasance by the DHS in placing [Hanna] in removal proceedings" and that the investigations that gave rise to the removal proceedings were not relevant to the substantive removability issues. A.R. 93.

On July 17, 2013, the IJ issued a 14-page decision sustaining the charges of removability against Hanna. The IJ first evaluated each witness's credibility. The IJ explained that he found Hanna's testimony not credible based on a number of internal inconsistencies and on the basis that some of his testimony was simply implausible, e.g., that he dated Williford while she lived in North Carolina and he lived in New Jersey. The IJ found Agent Brant's testimony credible given his credentials and that his testimony was consistent with other evidence.

11

Ultimately, the IJ concluded that the DHS had shown by clear and convincing evidence that Hanna entered into a fraudulent marriage to benefit his immigration status. The IJ found the circumstances surrounding the courthouse wedding suspect, given that no family or friends attended, Hanna purportedly lived in New Jersey during the courtship, and the wedding occurred a mere two months after his extant immigration status in the United States had expired.

The IJ specifically found that the couple had not continuously lived together before the alleged separation and that the constant changes of addresses before important immigration dates, and the inconsistencies of Williford's home address on legal documents, also indicated that the marriage was fraudulent. The IJ found that Hanna's frequent and lengthy trips abroad without his spouse also evidenced the lack of bona fides in the marriage.

As for Williford's sworn statement, the IJ noted that Agent Brant gave her the opportunity to review the statement and make changes. Although Williford was not present at the removal hearing, the IJ concluded that the statement was relevant based on the totality of the record. The IJ, however, gave the statement reduced weight because Williford was not subject to cross-examination.

Finally, the IJ concluded that Hanna had failed to rebut the DHS's showing that he is removable. Hanna submitted affidavits by three of his friends that described the nature of Hanna's marriage, but the IJ did not find the affidavits reliable because the witnesses were biased, the affidavits were dated after the marriage was called into question, and some of the witnesses' descriptions of the marriage conflicted with Hanna's removal hearing testimony. For example, one affiant claimed that Hanna and Williford had been dating for "several years" and were seen as a couple as early as 2000. A.R. 248. The IJ also gave the affidavits limited weight because none of the affiants testified at the removal hearing. Moreover, although bank statements showed that Hanna and Williford were joint account holders, none of the checks drawn on the account contained Williford's printed name or signature, thus supporting the inference that the couple was "married . . . in name only." A.R. 100.

Hanna appealed the IJ's decision to the BIA. The BIA agreed with the IJ that the DHS had proved by clear and convincing evidence that Hanna "failed to fulfill his marital agreement with his ex-wife, and that he obtained his lawful permanent residence through fraud or willful misrepresentation of material fact." A.R. 5. It also agreed that Hanna's evidence of a bona fide marriage was insufficient to rebut the DHS's evidence and

13

that the IJ had not erred or abused his discretion in his evidentiary rulings. On March 17, 2015, the BIA dismissed his appeal. This timely petition for review followed.

II.

A.

When "the BIA adopts the IJ's decision and includes its own reasons for affirming, we review both decisions." Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011) (quoting Marynenka v. Holder, 592 F.3d 594, 600 (4th Cir. 2010)). We must uphold the agency's decision unless it is "manifestly contrary to the law and an abuse of discretion." Id. (quoting Lizama v. Holder, 629 F.3d 440, 444 (4th Cir. 2011)); see also 8 U.S.C. § 1252(b)(4)(C). The agency abuses its discretion "if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." Tassi v. Holder, 660 F.3d 710, 719 (4th Cir. 2011).

We review the agency's factual findings under a "narrow and deferential" standard. Djadjou, 662 F.3d at 273 (citing Dankam v. Gonzales, 495 F.3d 113, 119 (4th Cir. 2007)). "We seek to ensure that the agency's factual findings are supported by substantial evidence," which is evidence that "exists to support a finding unless the evidence . . . was such that any reasonable adjudicator would have been compelled to conclude to the contrary." Id.; see also 8 U.S.C. § 1252(b)(4)(B).

14

Legal contentions raised in the immigration context, including those alleging a denial of due process, are reviewed de novo. Xing Yang Yang v. Holder, 770 F.3d 294, 302 (4th Cir. 2014); Blanco de Belbruno v. Ashcroft, 362 F.3d 272, 278 (4th Cir. 2004).

B.

Hanna contends that (1) the government failed to satisfy its burden of proving removability by clear and convincing evidence; (2) the admission into evidence of Williford's sworn statement without procuring her presence at the removal hearing so that she could be cross-examined deprived him of due process; and (3) the exclusion of evidence bearing on the government's alleged motive in seeking his removal deprived him of due process. We consider each of these issues in turn.

1.

Preliminarily, the government argues that Hanna has waived any argument as to whether the DHS proved by clear and convincing evidence that Hanna was subject to removal. The government argues that this is so because Hanna failed to address his burden to show that no "reasonable person would have been compelled" to reach the same result. Appellee's Br. 25, 30. We reject this contention. In his opening brief, Hanna argues that the totality of the evidence "does not prove a fraudulent marriage by clear and convincing evidence." Appellant's Br. 18.

15

Although he does not use the magic words, he, in essence, launches the appropriate argument and thus should not be penalized by elevating form over substance.

In any event, we have no hesitation in concluding that the IJ's findings and decision, as adopted by the BIA, were thorough, well reasoned, and supported by substantial evidence, and that the IJ satisfactorily identified the bases for the conclusion that he was persuaded clearly and convincingly that the marriage was fraudulent. No reasonable person would have been <u>compelled</u> to reach a different result.

Hanna and Williford were married only two months after Hanna's lawful immigration designation expired. That no family or friends attended the wedding, and that there were no photos taken, suggests that Hanna and Williford did not view the ceremony as a solemn and special occasion as would most genuinely married couples. Although Hanna testified in a way that, if believed, might explain these circumstances, on the whole record, the IJ was not bound to credit that testimony, as he did not.

Hanna testified that he and Williford had only dated a few months, which by itself does not erect a badge of fraud. Nevertheless, the IJ permissibly discredited Hanna's testimony that the courtship was genuine in light of the fact that during this brief courtship in early 2001, the records show that Hanna

16

was living in New Jersey while Williford lived in North Carolina.

The record shows that Williford changed her address multiple times, assertedly living in two different places at the same time, particularly in advance of significant immigration dates. For example, on October 23, 2002, two days prior to a scheduled immigration interview, Williford changed her address at the DMV to the Shady Meadow Circle residence, where Hanna had claimed they lived. Months later, however, in February 2003, in response to a traffic citation, Williford claimed that she lived at her mother's address in Siler City. She officially changed her address to Siler City at the DMV the following month. In the same vein, Hanna testified that he and Williford separated in March 2006 but then noted in his naturalization application that they lived together in June 2006, and he noted in the divorce proceedings that they had been separated since at least October 2005.

Hanna attempted to reconcile these and similar discrepancies by testifying that Williford often left for weeks at a time following disagreements and chose not to accompany him on lengthy trips abroad. The IJ permissibly discounted the probative value of this testimony, just as he discounted Hanna's assertion that he, a businessman with more than a middling competence in the English language, did not read the divorce

17

paperwork before signing it. Of course, the IJ also permissibly considered the impeaching effect of Hanna's failure to disclose his criminal history, a conviction for larceny, on earlier filed immigration documents.[2]

Indeed, given the binary nature of the question before the IJ, Hanna's false or implausible testimony, which the IJ permissibly characterized as "evasive[]," A.R. 95, did more harm than good. He intended his testimony to show that the marriage was genuine, but it actually tended to show that the marriage was not. No reasonable person reviewing the totality of the evidence in this record, in combination with the IJ and BIA's credibility determinations, would be compelled to conclude that the marriage was bona fide. Accordingly, we conclude that the government's showing was sufficient to enable the IJ to find by

---

[2] Other evidence probative of the fraudulent character of the marriage was likewise permissibly weighed by the IJ. While the couple purportedly shared bank accounts at Wachovia, all of the checks that Hanna produced bore only his name and signature. Hanna could not explain why, if Williford wanted the divorce as he claimed, she did not respond to the divorce complaint or appear for the divorce proceedings. He also could not explain why Williford's address was altered on her pay stubs to conceal that her employer recorded her address at her mother's residence throughout 2002, the year after their wedding. In other words, there were several inconsistencies apparent in the pertinent documents from the Hanna immigration file presented during the removal hearing, and the only evidence to rebut them was Hanna's confusing and questionable testimony. Meanwhile, Agent Brant's testimony and Williford's sworn statement were consistent with and supported by the exhibits.

the clear and convincing standard that the marriage was fraudulently entered into.

2.

Hanna next argues that the IJ denied him due process when, having admitted Williford's sworn statement, the IJ failed to compel Williford to attend the removal hearing and testify, thereby depriving Hanna of an opportunity to cross-examine her. We conclude that Hanna suffered no cognizable prejudice from Williford's unavailability for cross-examination.[3]

"The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial." 8 C.F.R. § 1240.7(a). Moreover, immigration judges have the power to "interrogate, examine, and cross-examine aliens and any witnesses." Id. § 1003.10(b). Because the Federal Rules of

---

[3] Upon Hanna's testimony that Williford had attempted unsuccessfully to, in effect, "extort" $1,000,000 from him as the reason for her adverse admissions, see supra p. 6, the DHS attempted to procure Williford's voluntary presence during a continuance of the removal hearing granted at its request by the IJ. See A.R. 213-15. The DHS was unable to get her to testify. The record is silent as to why Williford refused to appear voluntarily, why she was not subpoenaed, or whether she needed or required, or was offered or enjoyed if she did, prosecutorial immunity for her role in the events at issue. Our resolution of the questions presented does not require us to explore any such issues.

Evidence do not apply in immigration proceedings, challenges to evidentiary determinations are limited to due process considerations. Anim v. Mukasey, 535 F.3d 243, 256 (4th Cir. 2008) (citing Alexandrov v. Gonzales, 442 F.3d 395, 404 (6th Cir. 2006)). To show a due process violation, the petitioner must establish that: (1) a defect in the proceeding rendered the proceeding fundamentally unfair and (2) the defect prejudiced the outcome of the case. Id.

Williford's information obviously was highly relevant and her statement was admissible because it directly related to whether the marriage was fraudulent. We discern no lack of reliability in the circumstances surrounding the taking of the statement by Agent Brant. Agent Brant testified under oath as to his conversation with Williford before she gave the statement, that she gave the statement with her attorney present, and that she was given the opportunity to review the statement and make corrections. No independent evidence contradicted or undermined anything contained in the sworn statement, and significantly, the IJ specifically noted that he gave the statement limited weight because Williford was not subject to cross-examination.

While the opportunity to cross-examine a witness "is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, [or]

20

vindictiveness," such as ex-spouses, Ching v. Mayorkas, 725 F.3d 1149, 1158 (9th Cir. 2013) (quoting Goldberg v. Kelly, 397 U.S. 254, 270 (1970)), the risk of erroneous deprivation is less present when there is substantial independent evidence that the marriage is fraudulent. Indeed, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." Gilbert v. Homar, 520 U.S. 924, 930 (1997) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). It "is not a technical conception with a fixed content unrelated to . . . [the] circumstances." Id. (quoting Cafeteria & Rest. Workers v. McElroy, 367 U.S. 886, 895 (1961)). Given the totality of the evidence here, and the substantial evidence (apart from the Williford statement) that the marriage was fraudulent, there is no basis to conclude that the failure to cross-examine Williford, and the limited weight afforded to her statement, was fundamentally unfair.

We also fail to see how Hanna was prejudiced by Williford's absence. Even without the sworn statement, there was sufficient unrebutted evidence that the marriage was fraudulent. The IJ gave several cogent reasons for his conclusion in that regard, which we will not repeat here. Suffice to say, attempts to show that the couple lived at the same address or shared the same assets (the bank accounts) were fraught with inconsistencies and were themselves self-defeating. Moreover, the IJ found credible

21

Agent Brant's testimony as to the suspiciousness of the relationship. Hanna argues, somewhat incongruously, that Williford's testimony could have clarified some of the discrepancies noted in the documentary evidence related to where she was living and other matters. We fail to see how this is so; her statement fully explained her motivation for completing the immigration documents as she did.

Finally, while Hanna's desire to challenge Williford's credibility is perhaps understandable, it is his own credibility (more particularly, his lack thereof) that sunk this ship. We defer to an IJ's credibility findings if those findings are supported by substantial evidence. Tewabe v. Gonzales, 446 F.3d 533, 538 (4th Cir. 2006) (quoting Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004)). If the IJ makes an adverse credibility finding, the IJ must give "specific, cogent reason[s] for his [or her] disbelief." Id. (second alteration in original) (quoting Camara, 378 F.3d at 367). The IJ should cite, for example, any "inconsistent statements, contradictory evidence, and inherently improbable testimony." Id. (quoting In re S-M-J-, 21 I. & N. Dec. 722, 729 (BIA 1997) (en banc)). Conversely, an IJ's credibility determinations are not supported by substantial evidence if they are "based on speculation, conjecture, or an otherwise unsupported personal opinion." Id.

22

(quoting Dia v. Ashcroft, 353 F.3d 228, 250 (3d Cir. 2003) (en banc)).

The IJ considered the appropriate factors in determining Hanna's credibility. Hanna's assertions that Williford might have been coerced and motivated by revenge are not supported by his own testimony or any other evidence in the record. Accordingly, we discern no prejudice arising from Williford's absence.

3.

Finally, Hanna argues that the IJ erred in denying his motion in limine, pursuant to which he sought to offer evidence intended to attack the government's motive in seeking his removal. Specifically, Hanna argues that he would have shown that the DHS targeted him for removal under the mistaken belief that he was a terrorist. We discern no error.

The exclusion of Hanna's proposed evidence is governed under the same standard as the failure to compel Williford to testify: Hanna must show that the challenged defect (1) made the proceeding fundamentally unfair and (2) prejudiced the outcome of the case. Anim, 535 F.3d at 256. Inherent under the first prong is whether "the evidence is probative." Id. (quoting Ezeagwuna v. Ashcroft, 325 F.3d 396, 405 (3d Cir. 2003)).

Hanna's argument here fails mainly because he does not show how evidence of the government's motive would be relevant to

23

determining whether he was removable on the ground that he employed a fraudulent marriage in order to obtain an immigration benefit. The DHS needed to show, by clear and convincing evidence, that Hanna was removable as charged. 8 C.F.R. § 1240.8(a). Once that burden was met, Hanna had "the burden of establishing that he . . . [was] eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion." Id. § 1240.8(d). The government's motive has no bearing on Hanna's removability, nor does Hanna assert any benefit or privilege that he would be entitled to based on any malicious intent by the DHS to selectively pursue removal against him. See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 488 (1999) ("As a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."). Indeed, the Supreme Court has cautioned against questioning the motive of the government in enforcing immigration laws. See id. at 491 ("The Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat . . . and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy.").

In short, there was neither legal error nor an abuse of discretion in the IJ's exclusion of motive evidence in this case.

## III.

For the reasons set forth, the petition for review is

DENIED.