**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1954**

SONIA ARACELI PEREZ VASQUEZ; J.S.G.P.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: March 11, 2021                                    Decided: July 9, 2021

Before KING, WYNN, and HARRIS, Circuit Judges.

Petition for review granted in part and dismissed in part, and remand awarded by published opinion. Judge Wynn wrote the opinion, in which Judge King and Judge Harris joined.

**ARGUED:** Jonathan Westreich, WESTREICH LAW, Alexandria, Virginia, for Petitioners. Margot Lynne Carter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Leslie McKay, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

WYNN, Circuit Judge:

Sonia Araceli Perez Vasquez ("Petitioner") and her minor daughter, natives and citizens of Honduras, appeal from the Board of Immigration Appeals' final order affirming the denial of their application for asylum, withholding of removal, and protection under the Convention Against Torture.[1] The central issue on appeal is whether the immigration judge and the Board of Immigration Appeals erred in concluding that Petitioner failed to demonstrate that she was persecuted on account of her membership in her proposed particular social group, namely her nuclear family.

For the reasons explained below, we answer that question in the affirmative. Accordingly, we grant the petition in part and remand for further proceedings.

I.

A.

In June 2016, Petitioner was living with her eleven-year-old daughter and her parents in Villanueva, Honduras.[2] Early that month, a young man called Petitioner; claimed to "represent[] a gang group"; and demanded that she begin paying the gang a monthly fee of 1,000 lempiras (roughly $43.00). A.R. 226.[3] The man informed Petitioner that the gang,

---

[1] Because Sonia Araceli Perez Vasquez is the lead applicant/petitioner in this case, our opinion focuses on her claims.

[2] "We detail th[e] [relevant] events as [Petitioner] described them in [her affidavit and] testimony, an account that the [immigration judge] found credible and that the [Board of Immigration Appeals] did not dispute." *Crespin-Valladares v. Holder*, 632 F.3d 117, 119–20 (4th Cir. 2011); *see also* 8 C.F.R. § 1208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").

[3] Citations to "A.R. _" refer to the Administrative Record filed by the parties in this appeal.

which is unspecified in the record, was aware that she traveled to San Pedro Sula every month to withdraw money that her common-law husband sent to her from the United States. The man also told Petitioner that the gang knew where she lived and what school her daughter attended, and he warned her that the gang would kill them both if Petitioner did not comply with the gang's demand for monthly payments.

True to the young man's word, at the end of June and every month that followed, gang members came to Petitioner's house with "guns and caps that almost covered their eyes" to collect the extortion fee. *Id.* On every visit, the gang members "threaten[ed] [Petitioner] and brandish[ed] their guns," reminding her that she "knew what was going to happen to [her and her] daughter if [she] did not pay them or obey their demands." *Id.* Indeed, she did know—she averred that she was aware of other individuals the gang had killed as an "example" after they failed to pay. A.R. 227. The gang also warned Petitioner that if she "said something to anyone" or "made a complaint," "they would kill [her] and [her] daughter." A.R. 72, 74.

Despite the gang's warnings, Petitioner made a report to the police, but the police never took any action. So, fearful for her and her daughter's safety, Petitioner paid the extortion fee to the gang for five months, with her husband sending her the demanded 1,000 lempiras every month. During those five months, Petitioner "was unable to sleep," "suffered from nightmares and depression," and became "so terrified" for her daughter's safety that she took her out of school. A.R. 226–27.

While Petitioner believed that paying the gang's fee was the only thing that would "stop [the gang] from hurting [her] and [her] daughter," her ability to pay it rested

3

precariously on conduct largely beyond her control—her husband continuing to send her enough money to pay the fee every month. A.R. 226. She feared that one day her husband might be unable to do so, and that she would not be able to meet the gang's demands. Petitioner eventually fled Honduras with her daughter. In November 2016, six months after she was initially approached by the gang, Petitioner and her daughter arrived in the United States and applied for admission at the port of entry in El Paso, Texas.

B.

Because Petitioner did not possess valid entry documents at the time of entry, the Government issued a Notice to Appear and instituted removal proceedings against her. Petitioner conceded removability as charged, but she applied for asylum, withholding of removal, and protection under the Convention Against Torture.

In her application (Form I-589), Petitioner relayed the account summarized above and described that she was "certain that [the gang members] [we]re looking for [her], and [that] if [she] returned they would find [her] and hurt . . . or kill [her]." A.R. 219. Her application indicated that she was seeking asylum and withholding of removal based on political opinion and membership in a particular social group. At the individual hearing, however, Petitioner (through her counsel) decided not to pursue a political-opinion claim. She instead relied solely on her membership in a particular social group, which she defined as her nuclear family comprised of herself, her husband, and her daughter.

Though the immigration judge fully credited Petitioner's testimony, he nevertheless denied all of her claims for relief and ordered that she and her daughter be removed to Honduras. Regarding her claims for asylum and withholding of removal, the immigration

judge found that Petitioner's nuclear family was a cognizable particular social group, and that she had established her membership in that group. However, the immigration judge held that Petitioner had failed to prove that she suffered persecution—i.e., the gang's extortion demands and death threats—*on account of* her membership in the proposed particular social group. Curiously, he reached that conclusion despite expressly acknowledging that it was "probably true" that "*but for [Petitioner's] husband being in the United States and sending money back*, she would not likely have been targeted or threatened." A.R. 49 (emphasis added). The immigration judge also denied Petitioner's claim under the Convention Against Torture.

On appeal to the Board of Immigration Appeals, Petitioner challenged the immigration judge's finding that she had failed to demonstrate a causal connection between her membership in her nuclear family and the persecution she suffered. She also raised two additional particular social groups for the first time—her "[e]xtended family" and "[m]embers of [a] nuclear family opposed to gangs." A.R. 15. Finally, Petitioner challenged the immigration court's jurisdiction based on the Supreme Court's intervening decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018).

The Board of Immigration Appeals denied all of Petitioner's claims for relief and dismissed her appeal in an unpublished opinion issued by a single member. Specifically, it affirmed the immigration judge's determination that Petitioner had failed to show that she was persecuted because of her membership in her nuclear family. Citing its precedent, including *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189 (BIA 2018), the Board of Immigration Appeals declined to consider the two new particular social groups that

5

Petitioner raised for the first time on appeal.[4] Furthermore, it held that Petitioner had failed to "meaningfully challenge" the immigration judge's denial of her claim under the Convention Against Torture and thus deemed the issue waived. A.R. 3 n.2. Finally, the Board of Immigration Appeals rejected Petitioner's jurisdictional challenge under *Pereira*. Petitioner timely petitioned for this Court's review.

## II.

Where, as here, the Board of Immigration Appeals has adopted and supplemented an immigration judge's decision, we review both decisions. *Hernandez-Cartagena v. Barr*, 977 F.3d 316, 319 (4th Cir. 2020). We review factual findings for substantial evidence, treating them as conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Chen v. Holder*, 742 F.3d 171, 178 (4th Cir.), *as amended* (May 30, 2014) (quoting 8 U.S.C. § 1252(b)(4)(B)). Legal determinations are reviewed *de novo*. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015). Further, single-member decisions of the Board of Immigration Appeals—such as the one subject to review here— are not entitled to *Chevron* deference.[5] *Martinez v. Holder*, 740 F.3d 902, 909–10 (4th Cir.), *as revised* (Jan. 27, 2014).

---

[4] As Petitioner did not raise either group on appeal to this Court, we do not consider them. *See* Fed. R. App. P. 28(a)(8)(A).

[5] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984) (holding that a court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by [the agency charged with administering the statute]," where Congress has not spoken directly to the issue).

III.

As an initial matter, Petitioner contends that under the Supreme Court's decision in *Pereira v. Sessions*, her Notice to Appear was defective because it failed to include the date or time of her removal hearing, and that this defect deprived the immigration court of jurisdiction. *See Pereira*, 138 S. Ct. at 2110, 2113–14 (holding that a Notice to Appear that fails to state the time or place of the hearing does not terminate a noncitizen's period of continuous physical presence in the U.S. for purposes of cancellation of removal). But we have already rejected the same argument in *United States v. Cortez*, holding that a Notice to Appear's failure to include the date or time of the hearing does not implicate the immigration court's jurisdiction or adjudicative authority. 930 F.3d 350, 358–66 (4th Cir. 2019). Therefore, we readily dismiss Petitioner's jurisdictional argument.

IV.

Turning to the merits, Petitioner argues that she has established that she was persecuted in Honduras on account of her membership in her proposed particular social group—her nuclear family.[6] We agree. In concluding otherwise, the immigration judge and

---

[6] Petitioner also claims for the first time on appeal that she fears future persecution on account of an imputed anti-gang political opinion. However, we lack jurisdiction to consider this argument. During Petitioner's hearing, the immigration judge specifically asked Petitioner whether she intended to pursue a political-opinion claim as indicated on her Form I-589. Her counsel declined, stating she would "primarily rely on [a] particular social group and [the Convention Against Torture]." A.R. 57–58. Accordingly, the immigration judge did not consider or analyze any political-opinion claim. On appeal to the Board of Immigration Appeals, Petitioner again did not raise—and thus the Board did not address—any political-opinion claim. Therefore, we conclude that Petitioner has failed to exhaust all available administrative remedies as to the imputed political-opinion claim that she now puts forth. *See Tiscareno-Garcia v. Holder*, 780 F.3d 205, 210 (4th Cir. 2015).

7

the Board of Immigration Appeals erred by applying a legally incorrect and "excessively narrow" approach to analyzing whether Petitioner satisfied the statutory nexus requirement—one that we have rejected time and time again. *Hernandez-Avalos*, 784 F.3d at 949.

Under well-established precedent in this Circuit, and based on the unrebutted, substantial evidence in the record, we hold that any reasonable adjudicator would be compelled to conclude that Petitioner's membership in her nuclear family was at least one central reason for her persecution. Therefore, we grant the petition and reverse the agency's determination as to this issue.

A.

Under the Immigration and Nationality Act, an applicant for asylum "must establish that [they] ha[ve] been 'subjected to past persecution' or 'ha[ve] a well-founded fear of future persecution' 'on account of' . . . 'race, religion, nationality, membership in a particular social group, or political opinion.'"[7] *Alvarez Lagos v. Barr*, 927 F.3d 236, 245 (4th Cir. 2019) (quoting *Tairou v. Whitaker*, 909 F.3d 702, 707 (4th Cir. 2018)); *see also* 8 U.S.C. § 1101(a)(42)(A). To do so, the applicant must demonstrate a "nexus" between

---

"And under 8 U.S.C. § 1252(d)(1), [this Court is] jurisdictionally barred from reviewing unexhausted claims." *Salgado-Sosa v. Sessions*, 882 F.3d 451, 459 (4th Cir. 2018).

[7] The requirements for withholding of removal are largely the same, except that withholding applicants must show a higher likelihood of persecution. Whereas asylum applicants need only show a "'reasonable possibility'—as low as a ten percent chance—of persecution," *Crespin-Valladares*, 632 F.3d at 126 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987)), withholding applicants must demonstrate a greater-than-fifty-percent likelihood of persecution (i.e., more likely than not), 8 C.F.R. § 1208.16(b).

one of the five statutorily protected grounds and the persecution they suffered or fear suffering. *Cruz v. Sessions*, 853 F.3d 122, 127 (4th Cir.), *as amended* (Mar. 14, 2017). The applicant satisfies the nexus requirement by showing that the protected ground was or would be "at least one central reason" for the persecution. *Crespin-Valladares*, 632 F.3d at 127 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

Importantly, the protected ground need not be "*the* central reason or even a dominant central reason" for the applicant's persecution. *Id.* (quoting *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009)). Rather, the applicant must demonstrate that their protected status was or would be "more than an incidental, tangential, superficial, or subordinate reason" for their persecution. *Id.* (internal quotation marks omitted) (quoting *Quinteros-Mendoza*, 556 F.3d at 164).

While a persecutor's motivation is a "classic factual question" reviewed for substantial evidence, *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248 (4th Cir. 2017) (quoting *Crespin-Valladares*, 632 F.3d at 128), we review *de novo* "whether the [Board of Immigration Appeals] and the [immigration judge] applied the correct legal standard" in their nexus analysis. *Cruz*, 853 F.3d at 128.

B.

Here, the immigration judge and the Board of Immigration Appeals erred by misapplying the statutory nexus requirement. In fact, they committed the same legal errors for which we have repeatedly admonished the agency. *See, e.g.*, *Hernandez-Cartagena*, 977 F.3d at 321–23; *Salgado-Sosa*, 882 F.3d at 457–59; *Zavaleta-Policiano*, 873 F.3d at 249–50; *Cruz*, 853 F.3d at 129–30; *Oliva v. Lynch*, 807 F.3d 53, 56, 59–61 (4th Cir. 2015);

9

*Hernandez-Avalos*, 784 F.3d at 949–50; *Cordova v. Holder*, 759 F.3d 332, 339–40 (4th Cir. 2014).

The agency first erred by incorrectly focusing on why the gang targeted Petitioner's family, rather than on why they targeted Petitioner herself. It further erred by failing to consider the intertwined reasons for the persecution Petitioner suffered.

1.

As to the first error, our precedent makes clear that in cases involving family-based particular social groups, "identifying why [the] [p]etitioner's *family* was targeted is not the relevant question" for nexus. *Hernandez-Cartagena*, 977 F.3d at 322 (emphasis added). Rather, the "operative question" is "whether [the petitioner's] membership [in their family] is 'a central reason why *[they], and not some other person*' [were] targeted." *Id.* at 321–22 (quoting *Alvarez Lagos*, 927 F.3d at 249); *see also Salgado-Sosa*, 882 F.3d at 458–59 ("[T]he BIA's decision improperly focused on whether [the petitioner]'s *family* was persecuted on account of a protected ground, rather than on whether [*the petitioner*] was persecuted because of a protected ground—here, his relationship to his family."); *Hernandez-Avalos*, 784 F.3d at 949–50.

Our decision in *Hernandez-Cartagena v. Barr* is instructive. *See* 977 F.3d at 321–22. Hernandez-Cartagena was a Salvadoran woman who, like Petitioner, had immediate family living in the United States—in Hernandez-Cartagena's case, her parents—and was targeted by a gang for extortion. *Id.* at 318. When the gang initially contacted Hernandez-Cartagena, they demanded that her parents send them money. *Id.* The gang warned Hernandez-Cartagena that if her family did not meet their demands, they would kill one of

her siblings. *Id.* Hernandez-Cartagena then "informed her parents about the threats, and, in response, [they] sent her money to give to the gang." *Id.* The family continued to comply with the gang's demands for some months. Eventually, however, Hernandez-Cartagena fled El Salvador to escape the gang. *Id.* at 319. Upon arriving in the United States, she sought asylum and asserted her membership in her family as the protected ground. *Id.*

The facts of this case align almost perfectly with those of *Hernandez-Cartagena*. In both cases, the petitioner had family members in the United States. A gang demanded money from those U.S.-based family members by threatening the petitioner back in the family's home country. The family complied with the gang's demands for some time, but eventually, the petitioner fled to the United States and sought asylum, raising her membership in her family as a protected ground.[8]

---

[8] We acknowledge that the gang in this case did not explicitly instruct Petitioner to obtain the demanded money from her husband, whereas the gang in *Hernandez-Cartagena* specifically told the applicant to get her parents to send them the money. *See Hernandez-Cartagena*, 977 F.3d at 318. But this difference is of no significance. As we recognized in *Zavaleta-Policiano*, "[i]t is unrealistic to expect that a gang would neatly explain . . . all the legally significant reasons it is targeting someone." *Zavaleta-Policiano*, 873 F.3d at 248. To hold otherwise would be to hinge the availability of asylum and withholding of removal on the exact manner in which the persecutor words or frames a threat against the applicant—which, needless to say, would be both unfair and unreasonable. Here, it would hardly make sense to deny relief to Petitioner—who is in a position materially indistinguishable from that of Hernandez-Cartagena—merely because the gang did not expressly tell her to get the money from her husband. As noted above, when the gang first communicated their extortion demands to Petitioner, they told her that *they knew she had a husband who sent her money from the United States every month*. Plainly, as we hold below, Petitioner's familial relationship to her husband—and the gang's knowledge thereof—was at least one central reason why they targeted her, and not some other person.

11

The parallels do not end there. As here, the immigration judge credited Hernandez-Cartagena's testimony, but nevertheless concluded that she had failed to demonstrate a nexus between the alleged persecution and her membership in her family. *Id.* Specifically, the immigration judge concluded that "the [gang's] primary motivation for targeting [Hernandez-Cartagena's] family was monetary gain," and that "there was nothing in the evidence presented which suggested that [her] family membership had anything to do with why the family was targeted for extortion or why [the] [p]etitioner was [persecuted]." *Id.* at 319, 321. Accordingly, the immigration judge denied Hernandez-Cartagena's asylum claim, and the Board of Immigration Appeals affirmed. *Id.* at 319.

We reversed, holding that the immigration judge "erred by focusing narrowly" on why the gang targeted Hernandez-Cartagena's *family*, rather than on why they targeted *Hernandez-Cartagena herself*, and not some other person. *Id.* at 321–22 (quoting *Salgado-Sosa*, 882 F.3d at 458). And "once the right question [was] asked," we explained, "the conclusion [was] quite clear: 'whatever [the gang]'s motives for targeting [her] family, [Hernandez-Cartagena herself] was targeted because of [her] membership in that family.'" *Id.* at 322 (third, fourth, and sixth alterations in original) (quoting *Salgado-Sosa*, 882 F.3d at 459). That is, the gang specifically targeted Hernandez-Cartagena, and not some other person, because they believed that *her* family had the "ability . . . to pay the extorted demands." *Id.* at 321. Thus, we held that "substantial evidence in the record compel[led] the conclusion that at least one central reason [Hernandez-Cartagena] was targeted was her membership in [her] family," and that the immigration judge had erred in finding otherwise. *Id.* at 322.

The immigration judge in this case made the same error. In concluding that Petitioner was not persecuted because of her familial ties, the immigration judge stressed that "[t]here [wa]s nothing in th[e] record to suggest that the extortionists, the gang members, had anything against [Petitioner's] *husband* or even [her] *family*." A.R. 49 (emphases added). The immigration judge's focus on why the gang targeted Petitioner's *family*, rather than *Petitioner herself*, is the same type of erroneous analysis that we rejected in *Hernandez-Cartagena*—as well as in various other cases. *See, e.g.*, *Salgado-Sosa*, 882 F.3d at 458–59; *Hernandez-Avalos*, 784 F.3d at 949–50.

For its part, the Board of Immigration Appeals compounded the immigration judge's error by failing to recognize it—which, as we have held, is an error of law that "necessarily constitute[s] an abuse of discretion." *Tassi v. Holder*, 660 F.3d 710, 725 (4th Cir. 2011). The agency's legal error requires us to at least vacate its decision.

2.

The immigration judge and the Board of Immigration Appeals also erred when they concluded that the gang was simply motivated by a desire for monetary gain, without properly considering other intertwined reasons for Petitioner's persecution. As we have "repeatedly emphasized, it is enough that the protected ground be *at least one* central reason for the persecution—that is, one central reason, *perhaps intertwined with others*, why the applicant, and not another person was threatened." *Hernandez-Cartagena*, 977 F.3d at 320 (second emphasis added) (quoting *Alvarez Lagos*, 927 F.3d at 250); *see also* *Salgado-Sosa*, 882 F.3d at 458; *Zavaleta-Policiano*, 873 F.3d at 248; *Hernandez-Avalos*, 882 F.3d at 949–50.

13

Here, the agency failed to follow this precedent. The immigration judge found that the gang targeted Petitioner not because of her familial relationship to her husband, but "simply because [she] had money[] [and] had the means to pay the extortion demands." A.R. 48–50. Similarly, the Board of Immigration Appeals concluded that the gang's "extortion demands likely were due to [their] desire to collect money to fund their criminal enterprise, not due to [Petitioner's] family membership." A.R. 4. We hold that the agency "erred by focusing narrowly on 'the immediate trigger'" for the gang's extortion demands and death threats—i.e., their "greed" or desire for monetary gain. *Salgado-Sosa*, 882 F.3d at 458 (quoting *Oliva*, 807 F.3d at 60). The agency's "fail[ure] to consider the intertwined reasons" for the persecution—in particular, Petitioner's familial relationship to her husband—constituted a "misapplication of the statutory nexus standard." *Hernandez-Cartagena*, 977 F.3d at 320 (quoting *Zavaleta-Policiano*, 873 F.3d at 248). This legal error provides an additional and independently sufficient ground for vacatur.[9]

---

[9] For the same reason, we reject the Government's argument that the lack of nexus in this case is demonstrated by Petitioner's testimony that the gangs demanded extortion payments from "many" other people besides her, "suggesting that the motive of the gang members was not to specifically harm members of [Petitioner's] family, but rather, to maximize their income." Resp. Br. at 20. Even if the gang targeted Petitioner out of a desire to maximize their income, her familial relationship to her husband—i.e., the source of her money—was another central reason intertwined with that monetary motive. Furthermore, as we have previously held, the fact "that the criminal activities of [a gang] affect the population as a whole . . . is simply beside the point in evaluating an individual's particular claim." *Alvarez Lagos*, 927 F.3d at 251 (alterations in original) (internal quotation marks omitted) (quoting *Zavaleta-Policiano*, 873 F.3d at 248).

14

C.

Generally, when the agency legally errs as it did here, "the proper course" is "to remand . . . for additional investigation or explanation." *Id.* at 321 (quoting *Alvarez Lagos*, 927 F.3d at 249). But when the "relevant record evidence, . . . [properly] considered, would compel any reasonable adjudicator to reach" a conclusion opposite to that reached by the agency, "then a remand is unnecessary, and we will reverse the [agency]'s finding." *Id.* (alteration modified) (quoting *Alvarez Lagos*, 927 F.3d at 249). Specifically, in cases where the record evidence conclusively demonstrated that the applicant's protected status was at least one central reason why they, and not some other person, were targeted, we have reversed the agency's determination that the applicant failed to meet the nexus requirement. *See, e.g., id.* 321–23; *Alvarez Lagos*, 927 F.3d at 249–52; *Salgado-Sosa*, 882 F.3d at 457–59; *Cruz*, 853 F.3d at 130; *Zavaleta-Policiano*, 873 F.3d at 249–50; *Oliva*, 807 F.3d at 59–61; *Hernandez-Avalos*, 784 F.3d at 950. We conclude that the same relief is warranted here.

Just as in *Hernandez-Cartagena*, the record evidence in this case compels only one reasonable conclusion: the gang targeted Petitioner, and not some other person, because of her familial relationship to her husband, who sent her money from the United States every month. At her individual hearing, Petitioner credibly testified that when the gang first contacted her to demand extortion payments, they told her that they knew she traveled to San Pedro Sula every month to withdraw money that her husband sent to her from the United States. The gang's mention of this fact clearly suggested that they believed she had the means to pay the demanded fee *by virtue of her familial relationship to her husband who regularly sent her money*.

15

Indeed, Petitioner further stated during the hearing that she was able to meet the gang's demands only because her husband continued to send her money. And based on this evidence, the immigration judge explicitly acknowledged that it was "probably true" that "*but for [Petitioner's] husband being in the United States and sending money back*, she would not likely have been targeted or threatened" by the gang. A.R. 49 (emphasis added). Thus, even if the gang was motivated by monetary gain, that reason was inevitably intertwined with Petitioner's familial relationship to her husband, or in other words, her membership in her nuclear family.

None of the agency's reasons for declining to find a nexus—several of which the Government echoes on appeal—are persuasive. First, the immigration judge and the Board of Immigration Appeals found it significant that other members of Petitioner's family in Honduras, including her parents and her husband's mother, were never harmed or threatened with harm. That was legal error.

At her individual hearing, Petitioner alleged that she was persecuted on account of her membership in her *nuclear family*, which she defined as being comprised only of herself, her husband, and her daughter. Notably, that construction is supported by this Court's precedent as well as the dictionary definition of "nuclear family." *See Cruz*, 853 F.3d at 129 (noting that an asylum applicant's nuclear family consisted only of the applicant, her husband, and their children); *Nuclear Family*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/128926?redirectedFrom=nuclear+family# eid34375747 (defining "nuclear family" as "the basic family group consisting typically of father, mother, and their dependent children"). And here, the gang "in fact threatened to

16

harm all nuclear family members" of Petitioner who were living in Honduras—specifically, Petitioner and her daughter. *Cruz*, 853 F.3d at 129. The agency erroneously "g[ave] weight to the [irrelevant] fact that [the gang] did not threaten additional family members other than . . . members of [Petitioner's] immediate, nuclear family." *Id.* In doing so, the agency effectively mischaracterized Petitioner's proposed particular social group, which—as we have held—is a "critical legal error[]." *Alvarez Lagos*, 927 F.3d at 253.

Second, the immigration judge reasoned, and the Government asserts, that no nexus exists between Petitioner's persecution and her membership in her nuclear family because she may have faced the same harms from the gang had it been another relative or a friend, rather than her husband, who sent her money every month. But such counterfactuals are of little value or relevance. The *actual, undisputed facts* in this case indicated that Petitioner's familial relationship to her husband—that is, her membership in her nuclear family—was at least one central reason why the gang targeted her for extortion. Indeed, we previously rejected a similar, hypothetical musing in *Cruz v. Sessions*, where the immigration judge improperly relied on a finding that the alleged persecutor—who was likely responsible for the sudden disappearance of the petitioner's husband—may well have targeted any person interested in investigating the husband's whereabouts, even those outside the petitioner's nuclear family. *See* 853 F.3d at 129.

Moreover, the immigration judge's view of Petitioner's husband as a fungible source of money for Petitioner was fundamentally misplaced. As we have explained in prior cases, individuals are generally more vulnerable to threats and persecution based on family relationships than those based on other relationships, given the "innate," special,

17

and "unchangeable" nature of "family bonds."[10] *Crespin-Valladares*, 632 F.3d at 124. For instance, in *Hernandez-Cartagena*, we emphasized that it was "unreasonable [for the agency] to conclude that the fact that [the] [p]etitioner [was] her parents' child—*a member of their family, [special] concern for whom might motivate . . . payments to the gang*—[was] not at least one central reason for her persecution." 977 F.3d at 323 (emphasis added).

Here, the unrebutted evidence demonstrates that the gang leveraged Petitioner's familial relationship to her husband, as well as their familial relationships to their daughter, to incentivize payment. Again, the gang extorted money from Petitioner and threatened her and her daughter with death, while explicitly stating that they knew she received money every month from her husband in the United States. And the gang's threats had just the intended effect. After learning of those threats, Petitioner's husband sent additional money every month for the specific purpose of paying the gang so "they wouldn't kill [his wife and his daughter]." A.R. 71. Thus, just as in *Hernandez-Cartagena*, it was "unreasonable" for the agency to conclude that Petitioner's status as her husband's spouse was "not at least one central reason for [Petitioner's] persecution." *Hernandez-Cartagena*, 977 F.3d at 323.

Third, the immigration judge and the Board of Immigration Appeals made much of the fact that Petitioner had already been receiving money from her husband for eleven years by the time the gang first approached her. Yet we have previously held that "while the timing of threats can be relevant in determining a persecutor's motivation, . . . it is not

---

[10] For this very reason, we have long held that the nuclear family is "a prototypical example of a particular social group." *Crespin-Valladares*, 632 F.3d at 125 (internal quotation marks omitted) (quoting *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986)).

18

dispositive." *Alvarez Lagos*, 927 F.3d at 251 (citation omitted). There is no evidence in the record suggesting that the gang knew about Petitioner's arrangement with her husband before they decided to commence threatening her. And even if such evidence existed, that alone would not alter our nexus calculation under these circumstances, where the record makes clear that the gang targeted Petitioner for extortion because they knew her husband was sending her money every month.

Finally, while the immigration judge emphasized—as does the Government—that Petitioner herself testified that she did not know why she was targeted, that fact is hardly dispositive. As we recently recognized in *Arevalo Quintero v. Garland*, it is not uncommon for an asylum applicant to be unaware of the reasons for the persecution they suffered or fear suffering. *Arevalo Quintero v. Garland*, 998 F.3d 612, 625 n.12 (4th Cir. 2021). Further, even when the applicant knows the reasons, "[o]bstacles like language barriers, past trauma, limited legal knowledge, and restricted access to basic social services often impede asylum seekers from effectively telling their stories." *Id.* at 632 n.21 (quoting Sabrineh Ardalan, *Access to Justice for Asylum Seekers: Developing an Effective Model of Holistic Asylum Representation*, 48 U. MICH. J. L. REFORM 1001, 1013 (2015)).

In light of this reality, we have held—as has the Board of Immigration Appeals— that under both international and U.S. refugee law, immigration adjudicators have a "duty to ascertain and evaluate all the relevant facts" and to "ensur[e] that refugee protection is provided where such protection is warranted by the circumstances of an asylum applicant's claim." *Id.* at 625 (quoting *Matter of S-M-J-*, 21 I. & N. Dec. 722, 723, 729 (BIA 1997)). And here, because the unrebutted evidence in the record would compel any reasonable

adjudicator to conclude that the gang targeted Petitioner on account of her membership in her nuclear family, Petitioner's inability to articulate the reasons for her persecution hardly undermined her claim.

*　　*　　*

In sum, we hold that Petitioner has established a nexus between her membership in her proposed particular social group and the persecution she suffered, and that the agency erred in holding otherwise. Our precedent regarding how nexus should be analyzed in asylum and withholding-of-removal cases is well-established. Thus, we have made it clear that all immigration adjudicators must evaluate each asylum or withholding application in a manner faithful to the applicable precedent and must carry out their "affirmative duty" under domestic and international refugee law to assist and "work with asylum seekers to ensure that protection is granted to those whose factual circumstances warrant it." *Id.* at 631 (emphasis omitted).

For the foregoing reasons, we reverse the agency's determination as to nexus, vacate the final order of removal as well as the denial of Petitioner's application for asylum and withholding of removal, and remand for further proceedings consistent with this opinion.[11]

---

[11] Notably, the Board of Immigration Appeals' decision suggested that the immigration judge's determination that Petitioner's nuclear family was a cognizable social group may be inconsistent with the former Attorney General's decision in *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019). However, the current Attorney General has recently vacated *Matter of L-E-A-* in its entirety, and thus that decision lacks legal force. *See Matter of L-E-A-*, 28 I. & N. Dec. 304 (A.G. 2021). And at any rate, *Matter of L-E-A-* conflicted with our well-established precedent recognizing nuclear families as cognizable social groups, *see, e.g.*, *Hernandez-Cartagena*, 977 F.3d at 320 ("We have repeatedly held 'a nuclear family

V.

Petitioner also contends that she is entitled to relief under the Convention Against Torture. However, we conclude that she has failed to exhaust all available administrative remedies as to this claim. Thus, we lack jurisdiction to consider it.

Under 8 U.S.C. § 1252(d)(1), federal courts may review a final order of removal "only if" the noncitizen "has exhausted all administrative remedies available." 8 U.S.C. § 1252(d)(1). We have interpreted this provision as a jurisdictional bar, holding that a noncitizen's failure to exhaust administrative remedies as to a particular claim bars judicial review of that claim. *See Massis v. Mukasey*, 549 F.3d 631, 638 (4th Cir. 2008). "Ordinarily, a petitioner exhausts [their] administrative remedies by raising an argument challenging the [immigration judge's] decision in an appeal to the [Board of Immigration Appeals]." *Cabrera v. Barr*, 930 F.3d 627, 631 (4th Cir. 2019). Therefore, "arguments that a petitioner did not raise [before the Board] have not been exhausted and the Court lacks jurisdiction to consider them." *Id.*

That being said, as "no statute defines what constitutes 'exhaustion' for purposes of § 1252(d)(1)," determining whether a claim has been administratively exhausted requires

---

provides a prototypical example of a particular social group' cognizable in our asylum framework." (quoting *Cedillos-Cedillos v. Barr*, 962 F.3d 817, 824 (4th Cir. 2020))).

Moreover, while the Board of Immigration Appeals also seemed to question—again, without deciding—whether the harm Petitioner suffered amounted to "persecution," we have held that "[e]xtortion itself can constitute persecution, even if the targeted individual will be physically harmed only upon failure to pay." *Oliva*, 807 F.3d at 59. And "this Court has repeatedly and expressly held that the threat of death qualifies as persecution." *Zavaleta-Policiano*, 873 F.3d at 247 (internal quotation marks omitted) (quoting *Hernandez-Avalos*, 784 F.3d at 949).

a careful inquiry. *Id.* Our precedent provides a few guiding principles. First, consistent with the approach adopted by a majority of our sister circuits, we have held that "a petitioner has exhausted [their] administrative remedies when the [Board of Immigration Appeals] has issued a definitive ruling on the issue raised in the petition for review"—even where the Board does so *sua sponte*, without the petitioner actually raising that issue before the Board. *Id.* at 633; *see also Portillo Flores v. Garland*, No. 19-1591, 2021 WL 2655334, at *10–11 (4th Cir. June 29, 2021) (en banc); *Mazariegos-Paiz v. Holder*, 734 F.3d 57, 63 (1st Cir. 2013) (collecting cases from other circuits). Recently, we have also noted that appellants "need not conjure any 'magic words' to raise an issue [before the Board of Immigration Appeals, but] simply need[] to 'launch[] the appropriate argument.'" *Atemnkeng v. Barr*, 948 F.3d 231, 240 (4th Cir. 2020) (quoting *Hanna v. Lynch*, 644 F. App'x 261, 268 (4th Cir. 2016)). The exhaustion requirement "bars consideration of '*general issues* that were not raised below,'" and appellants "should *not be penalized* by evaluating form over substance" where their "arguments before the [Board] in essence raised" the claim at issue. *Id.* at 240–41 (first emphasis added) (first quoting *Ramirez v. Sessions*, 887 F.3d 693, 700 (4th Cir.), *as amended* (June 7, 2018); then quoting *Hanna*, 644 F. App'x at 268).

Applying these principles here, we hold that Petitioner failed to exhaust all administrative remedies as to her Convention Against Torture claim. Quite plainly, her counsel did not adequately raise the claim before the Board of Immigration Appeals. Petitioner's brief before the Board did not reference the Convention Against Torture beyond merely mentioning in the procedural history section that Petitioner had applied for

relief under the Convention and listing "CAT" as a bullet point under the subheading "Grounds for Asylum," without any further elaboration. A.R. 12, 14. Her brief also never mentioned the word "torture" even once, let alone included any argument regarding her Convention Against Torture claim or cited any relevant case law. Nor did Petitioner's Notice of Appeal to the Board of Immigration Appeals contain anything related to Convention Against Torture relief. Presumably for these reasons, the Board of Immigration Appeals concluded that Petitioner had failed to "meaningfully challenge" the immigration judge's denial of relief under the Convention Against Torture, thus deeming the issue waived. A.R. 3 n.2.

Because Petitioner failed to adequately raise her Convention Against Torture claim before the Board of Immigration Appeals, and because the Board deemed the issue waived and declined to address it on the merits, we conclude that the claim has not been administratively exhausted as required by 8 U.S.C. § 1252(d)(1). Thus, we dismiss the petition as to this claim for lack of jurisdiction.

VI.

In conclusion, we grant the petition for review as to Petitioner's asylum and withholding-of-removal claims, reverse the agency's nexus determination, vacate the final order of removal, and remand for further proceedings consistent with this opinion. As to her Convention Against Torture claim, we dismiss the petition for lack of jurisdiction.

*PETITION GRANTED IN PART
AND DISMISSED IN PART;
REMANDED*

23