**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-2124**

RICCY MABEL FUNEZ-MUNGUIA; A.I.F.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 27, 2021                          Decided: November 23, 2021

Before GREGORY, Chief Judge, and WYNN and HARRIS, Circuit Judges.

Petition for review granted; vacated and remanded by unpublished opinion. Judge Harris wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined.

**ARGUED:** Bradley Bruce Banias, WASDEN BANIAS LLC, Charleston, South Carolina, for Petitioners. Robert Dale Tennyson, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Brian Boynton, Acting Assistant Attorney General, Nancy E. Friedman, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Riccy Mabel Funez-Munguia ("Funez") came to the United States from Honduras after she was threatened by a gang member who lived in her apartment building. According to Funez, the gang member persecuted her on account of her familial relationship with the apartment manager, worried that she would use her influence with the manager to have him evicted. An Immigration Judge denied relief from removal and the Board of Immigration Appeals affirmed, holding that there was no "nexus" between Funez's family relationship and the threats against her. Because the agency incorrectly applied the statutory nexus standard, we grant the petition for review, vacate the agency's decision, and remand for further proceedings.

## I.

In April 2016, Funez entered the United States with her minor daughter. After the government placed the two in removal proceedings, Funez applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").[1]

## A.

The Immigration Judge ("IJ") deemed credible Funez's account of the events that led to her flight from Honduras, and we begin with a summary of that account. Early in

---

[1] Funez's daughter, A.I.F., also appears as a petitioner, but is eligible for relief only as a derivative applicant, or rider, on Funez's application. *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.21(a). Because Funez is the lead applicant, our opinion focuses on her claims. *See Perez Vasquez v. Garland*, 4 F.4th 213, 218 n.1 (4th Cir. 2021).

2015, Funez moved into an apartment building in the Serrito Lindo neighborhood of San Pedro Sula, Honduras. She then learned that her cousin's husband, Anibal Alvarenga, once had owned the building and continued to be "in charge of the apartments," collecting rent and managing it for a new owner who lived in the United States. A.R. 388. Funez believed that other tenants in the building knew of this relationship because her daughter publicly greeted Funez's cousin as "Aunt." A.R. 389; *see also* A.R. 185 (cousin stating that Funez was "like another sister" to her).

In June 2015, a gang member named Oscar, who had lived in the building until his arrest earlier that year, was released from jail. He returned to the building and almost immediately began to harass Funez. In their first encounter, in July 2015, he accosted Funez while she was out with her daughter and accused her of trying to have him evicted from the building – which she could do, he claimed, "because [she was] related to the owners." A.R. 389–90 ("They tell me that you're going to decide[] who lives there because you're related to the owners."). Funez understood Oscar to be referring to her relationship with Alvarenga, and explained that Alvarenga no longer owned the apartments and that she "was nothing to the owners." A.R. 390. Oscar angrily pointed at her and told her to "watch out," which Funez took to be a threat against her and her daughter. *Id.* She testified that she feared Oscar could have killed her that night.

Over the next several months, Oscar continued to target Funez. But he no longer mentioned her family, the building's owner, or Alvarenga; and eventually he stopped mentioning the building altogether. First, late one night in October 2015, Oscar and six men confronted Funez with guns drawn, asking if she was "going to let [them] live there."

3

A.R. 391. She denied having any say over such matters and swore that she had "nothing to do with the owner." *Id.* Oscar declared that he was "going to live there" and let her go. *Id.* Then, the next month, Oscar walked into the building's laundry room, again carrying a gun, and slapped Funez in the face without explanation.

At that point, fearing Oscar's hostility, Funez moved out of Serrito Lindo to a town about an hour away. Soon after, however, Oscar caught up with her: In January 2016, he called her cell phone, claiming that he knew where she lived and worked, and that he would find and kill her. And in February 2016, he called again, threatening to find her, kill her, and "cut [her] up in little pieces and feed [her] to the dogs." A.R. 393. The next month, scared that Oscar would follow through on these threats, Funez fled with her daughter to the United States.

Upon crossing the border, Funez turned herself in to immigration authorities. She was then given an interview with an asylum officer, who concluded that she had a credible fear of persecution because Oscar "thought that [she] was the family member of the owners of the building" and "that [she] would keep him and his friends from taking the building over," and had threatened her as a result. A.R. 488–89.

**B.**

After conceding removability, Funez applied for asylum, withholding of removal, and CAT relief. The IJ found Funez's testimony credible but denied her application in its

entirety. Because Funez has abandoned any challenge to the denial of CAT relief, we focus exclusively on her claims to asylum and withholding of removal.[2]

The IJ rejected those claims on a single ground: According to the IJ, Funez had not shown that any persecution she feared or had suffered was "on account of" – that is, had a nexus to – her familial relationship with Alvarenga. *See* 8 U.S.C. § 1101(a)(42)(A) (identifying protected grounds supporting asylum); *id.* § 1231(b)(3)(A) (same for withholding of removal). The IJ recognized that persecution on account of kinship ties may qualify for protection. *See, e.g.*, *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011). But here, the IJ concluded, the record did not support Funez's claim that Oscar in fact was motivated by her family ties when he harassed her.

As to the first, July 2015 incident, the IJ acknowledged that Oscar referred to Funez's family ties in stating that she would "decide[] who lived in the building *because she is related to the owners*." A.R. 67 (emphasis added). The IJ went on, however, to note that Oscar mentioned only the "owner" of the building – no longer Alvarenga – and that Oscar in fact never was threatened with eviction. *Id.* "At most," the IJ concluded, the "record reflects that Oscar was upset that [Funez] may have been attempting to use her position to influence the owner of the building to have [him] removed." A.R. 69. As for the later episodes and threats, the IJ held, there was no evidence that they were motivated

---

[2] The Board of Immigration Appeals ("BIA") determined that Funez failed to challenge the IJ's denial of CAT protection in her appeal to the Board, and Funez neither challenges that determination nor addresses the merits of her CAT claim on appeal to this court. Accordingly, the question of CAT protection is not before us, and we do not address it further. *See Cedillos-Cedillos v. Barr*, 962 F.3d 817, 822–23 nn.2–3 (4th Cir. 2020).

by family ties, given Oscar's failure to mention family, or even the building, during those incidents. Instead, the IJ expressed his "suspicions that there was something else going on in this case," especially with respect to the escalating threats that came after Funez had left the building. A.R. 68.

For those reasons, the IJ summed up, the record lacked "any direct or circumstantial evidence" tying Oscar's actions to Funez's familial relationship. A.R. 69. And without that evidence, Funez could prevail neither on her asylum claim nor under the more demanding standard for withholding of removal.[3]

The Board of Immigration Appeals ("BIA") affirmed the denial of asylum and withholding relief "for the reasons set forth by the Immigration Judge," agreeing that Funez had failed to establish the necessary nexus to family ties. A.R. 3. Specifically, the Board reasoned, the IJ "did not commit clear error in finding that [Oscar] was motivated by his mistaken belief that [Funez] could have him evicted from the apartment where he lived, including his mistaken belief that she was related to the owner, rather than by her actual familial relationship with the rent collector." A.R. 3–4.

Funez and her daughter timely petitioned this court for review.

---

[3] As the IJ noted, an applicant who "fails on her asylum claim will necessarily fail on her withholding [o]f removal claim" as well. A.R. 69. For both forms of relief, an applicant must show persecution on account of a statutorily protected ground. But "withholding of removal implicates a more demanding standard of proof," *id.*, requiring the applicant to establish a "clear probability" of persecution rather than the "well-founded fear" sufficient to make out an asylum claim, *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010).

6

## II.

To qualify for relief, Funez must show that she "(1) has a well-founded fear of persecution; (2) on account of a protected ground; (3) by an organization that the [Honduran] government is unable or unwilling to control." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) (outlining asylum criteria); *see also Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010) (outlining same criteria for withholding of removal, but subject to a higher "clear probability" standard). Here, the agency addressed only the "on account of" requirement of the second factor, denying Funez's asylum and withholding claims because she failed to establish the requisite nexus to her family relations. We agree with Funez that the agency misapplied the nexus requirement, and therefore vacate its determination and remand for further proceedings.

In evaluating Funez's claim, we consider both the BIA's decision and that of the IJ. When, as here, the BIA adopts the opinion of an IJ and supplements it with its own reasoning, we review both rulings. *See Martinez v. Holder*, 740 F.3d 902, 908 (4th Cir. 2014) (citing *Barahona v. Holder*, 691 F.3d 349, 353 (4th Cir. 2012)). And when, as here, the BIA "holds that the IJ did not clearly err in making a factual finding, we must also examine the IJ's factual finding" on the issue. *See Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 246 (4th Cir. 2017) (internal quotation marks omitted). We review such factual findings for substantial evidence, "treating them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Perez Vasquez v. Garland*, 4 F.4th 213, 220 (4th Cir. 2021) (internal quotation marks omitted). Whether the agency

7

"applied the correct legal standard in [its] nexus analysis," however, is a legal question we review de novo. *Id.* at 221 (internal quotation marks omitted).

Here, the agency failed to apply the correct legal standard. "As we have repeatedly emphasized," to establish nexus to a protected ground, "it is enough that the protected ground be *at least one* central reason for the persecution." *Id*. at 224 (internal quotation marks omitted). And the record establishes that when Oscar targeted Funez in July 2015, her familial relationship with Alvarenga, the building's manager, was at least one central reason for Oscar's actions. That much is clear from his own statement, explaining that he believed Funez was "related to the owners" and would use that relationship to have him evicted. *See* A.R. 390 ("[Y]ou're going to decide who lives there because you're related to the owners."); *see also* A.R. 111, 113–14, 118, 124–25 (Funez's testimony to same effect). Indeed, the IJ himself acknowledged that Oscar initially accosted Funez because he was concerned that she would "use her position to influence the owner of the building" to have him removed, A.R. 69 – a "position" and "influence" that existed only by virtue of her family ties to Alvarenga, *see Hernandez-Avalos*, 784 F.3d at 949–50 (mother threatened by gang because of her influence over her son's refusal to join gang is persecuted "on account of" her family ties).[4]

---

[4] At oral argument, the government hypothesized that Oscar might have believed Funez had some influence over the building not because of her family relations but because she occasionally helped to collect rent. But that of course is not what Oscar said, and there is no record evidence suggesting that Oscar ever fell behind in his rent or had some other rent-related reason to fear eviction. Likely as a result, neither the IJ nor the BIA relied on this theory, and we will not do so here. *See, e.g.*, *Cordova v. Holder*, 759 F.3d 332, 337

8

The agency found – and the government argues on appeal – that Oscar threatened Funez not because of her kinship ties to Alvarenga, but only because he was angry that she was "attempting to have him removed" from the building, A.R. 68, or wanted him "evicted from the apartment where he lived," A.R. 4. But in this context, as we have explained, that is "a meaningless distinction." *Hernandez-Avalos*, 784 F.3d at 950 (rejecting agency conclusion that applicant was threatened "because she exercises control over her son's activities" and "not because she is his mother"); *see Cruz v. Sessions*, 853 F.3d 122, 129 (4th Cir. 2017) (applying *Hernandez-Avalos* to hold that the agency erred in "failing to consider the intertwined reasons" for a persecutor's threats). Oscar may indeed have felt "personal animosity" toward Funez because of what he understood to be her efforts to have him evicted. A.R. 68. But the reason Oscar targeted Funez – as opposed to some other neighbor who also might have preferred not to live with a gang member – was, as he said, her perceived ability to make good on those efforts by leveraging her familial relationship with Alvarenga. That is enough to show that Funez's familial relationship to Alvarenga was "one central reason, perhaps intertwined with others, why [she], and not another person was threatened." *Perez Vasquez*, 4 F.4th at 224 (emphasis omitted); *see also, e.g.*, *Hernandez-Avalos*, 784 F.3d at 950 (explaining that nexus requirement is satisfied if family relationship is one of "multiple central reasons" for persecution).

---

(4th Cir. 2014) (we may affirm the agency "only [on] the grounds upon which the agency acted" (internal quotation marks omitted)).

The agency and the government also focus on the fact that Oscar referred expressly to the "owner" of the building, while Alvarenga was the *former* owner and current manager of the apartment complex. But that has no bearing on Funez's claim, which is that she was targeted by Oscar in July 2015 at least in central part because she was related to someone with perceived authority over the building. Whether Oscar correctly understood the building's evolving ownership and management structure or the extent of Alvarenga's authority is beside the point; what matters is that he believed that Funez could use her familial relationship with Alvarenga to have him evicted. *See Cruz*, 853 F.3d at 130 (nexus requirement satisfied where persecutor "suspected" that applicant would have access to damaging information based on her marital relationship).

The BIA appears to have gone a step further, reasoning that Oscar mistakenly believed Funez was *not* related to Alvarenga but *instead* related to the current owner of the apartment building, living in the United States. At oral argument, the government declined to defend that theory, and properly so. In July 2015, Funez understood Oscar to be referring to her actual family relationship with former-owner and current-manager Alvarenga, and there is no record evidence to suggest that Oscar even was aware of a new owner in the United States, let alone under the misimpression that Funez was related to him or her, rather than to Alvarenga. And regardless, even on the BIA's hypothesized series of errors, this would be a case of alleged "[p]ersecution for imputed grounds" – that is, persecution because one is "erroneously thought" to be part of a protected group or hold protected political views – which both we and the BIA have recognized may satisfy the nexus requirement. *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 450 (4th Cir. 2007) (internal

quotation marks omitted) (quoting *In re S-P-*, 21 I. & N. Dec. 486, 489 (BIA 1996)). Even if, that is, one central reason for Oscar's approach to Funez in July 2015 was that he mistakenly thought she was related to the building's United States owner, the agency has given no explanation for why that would not satisfy the nexus requirement.

Finally, to the extent the IJ suggested, and the government echoes on appeal, that a nexus finding is precluded by the fact that Oscar never was evicted, we disagree. The IJ and the government appear to take the position that because Funez *did* not use her family relationship to have Oscar removed, Oscar must have known that she *could* not have done so. *See* A.R. 67 (suggesting that because he was not evicted, Oscar would not have thought the "threat of removal from the building was a realistic possibility"). But what Oscar knew and did not know in July 2015 is best captured by what he said: that Funez would "decide[] who lives" in the building. A.R. 390; *see also* A.R. 391 (Oscar asking in October 2015 if Funez was "going to let [him] live there"). Further, the inference on which the government relies was unavailable to Oscar when he first approached Funez. At that point, his fears were entirely prospective, and he could not have known the outcome of Funez's purported efforts to have him evicted.[5]

---

[5] The government also suggests that Oscar's continued presence in the building in later months necessarily would have shown him that he had misjudged Funez's influence. As Funez argues, however, Oscar might more likely have assumed from his longevity only that his intimidation campaign was working as planned. As discussed below, we leave that question, along with other factual issues arising in subsequent months, to the agency on remand.

In sum, we conclude that the agency misapplied the statutory nexus standard when it found that the record lacked "any direct or circumstantial evidence," A.R. 69, that Funez's familial relationship with Alvarenga was at least "one central reason" Oscar approached her in July 2015, *Perez Vasquez*, 4 F.4th at 224. Because of that legal error, we vacate the agency's nexus finding and remand for further proceedings. *See id.* at 224 (holding that misapplication of the statutory nexus standard is a "legal error provid[ing] an . . . independently sufficient ground for vacatur").

Funez urges us to go further, reversing the agency's nexus finding and holding that the record compels the conclusion that she was subject to past persecution on account of her kinship ties. This we cannot do. As we have explained, the record makes unequivocally clear that Oscar's *initial* encounter with Funez, in July 2015, was motivated at least in central part by her kinship ties to Alvarenga. But whether Oscar's later threats also were on account of her familial relationship is a separate question. To be sure, Oscar's motive may well have stayed the same, so that he continued to target Funez for the same family-based reasons as before. As the IJ noted, however, at least some of the relevant facts had changed by the time of their later encounters: By November 2015, Funez had twice explained to Oscar that she had no influence over building management, and Oscar had ceased referring to her family ties and to the apartment altogether. And by January 2016, when Oscar's threats escalated, she had moved out of the building to a town an hour away.

Moreover, the agency has yet to consider which of Oscar's actions rose to the level of persecution, rather than "mere harassment." *See Portillo Flores v. Garland*, 3 F.4th 615,

12

627 (4th Cir. 2021) (en banc) (internal quotation marks omitted). While Oscar's explicit death threats in January and February of 2016 clearly would qualify, *see Bedoya v. Barr*, 981 F.3d 240, 246 (4th Cir. 2020) (collecting cases holding that death threats amount to persecution), whether Oscar's earlier threats also amount to persecution is, again, a separate question. We in no way prejudge those issues here. But this is a complicated case, and we follow our ordinary rule of remanding so that the agency may make the relevant factual assessments under the proper standard and in the first instance. *See Alvarez Lagos v. Barr*, 927 F.3d 236, 252 (4th Cir. 2019).[6]

### III.

For the reasons given above, the petition for review is granted, the agency's nexus determination is vacated, and the case is remanded to the BIA for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*

---

[6] Our remand includes both Funez's asylum claim and her withholding claim. Contrary to the government's suggestion, Funez has not abandoned her withholding claim before this court for failing to address it separately in her opening brief. Throughout these proceedings, the agency has intertwined the asylum and withholding claims, denying them in tandem under the same improper nexus analysis. *See* A.R. 3–4; *id.* at 69 (IJ denying withholding relief solely because "[a]n applicant who fails on her asylum claim will necessarily fail on her withholding [o]f removal claim"). Under those circumstances, Funez's challenge to the agency's nexus analysis plainly comprehends both her asylum and her withholding claims.